639 A.2d 786

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Daniel JACOBS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 1993.

Decided March 28, 1994.

---

404

Floyd P. Jones, York, for D. Jacobs.

John W. Thompson, York, for Com.

Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

### OPINION OF THE COURT

FLAHERTY, Justice.

In 1992, in a trial by jury in the Court of Common Pleas of York County, the appellant, Daniel Jacobs, was convicted of two counts of murder of the first degree. The convictions arose from the murders of Tammy Mock and Holly Jacobs, the girlfriend and infant daughter of the appellant, respective-

ly. The bodies of both victims were found in a bathtub at the apartment where appellant and the victims had resided. Tammy Mock had been stabbed more than 200 times. Holly Jacobs, just seven months of age, had been drowned in the bathtub.

A sentencing hearing was held pursuant to 42 Pa.C.S. § 9711, and the jury returned a verdict of death for the murder of Tammy Mock and a verdict of life imprisonment for the murder of Holly Jacobs. Judgments of sentence were, accordingly, entered. This direct appeal ensued.

As is our duty in cases where a sentence of death has been imposed, see *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we have reviewed the sufficiency of the evidence. The testimony established that the victims' bodies were found in appellant's apartment and that appellant admitted to his mother that he killed both victims. In addition, appellant himself testified that he fatally stabbed Tammy Mock. The evidence was, therefore, plainly sufficient.

Appellant contends that the trial court erred in allowing various allegedly inflammatory photographs to be submitted to the jury. Two of these were color photos taken at the autopsy of Tammy Mock. The photos depicted numerous stab wounds on Mock's body. The trial court described the photos as "almost antiseptic," since significant amounts of blood and tissue had been cleaned from the body before the photos were taken. The other challenged photos consisted of three black and white shots showing the positions of the bodies at the crime scene.

The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error. *Commonwealth v. McCutchen*, 499 Pa. 597, 602, 454 A.2d 547, 549 (1982). The determinative inquiry is whether the photos have evidentiary value that outweighs the possibility of inflam-

ing the minds and passions of the jurors. *Id.* As stated in *McCutchen,*

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

499 Pa. at 602, 454 A.2d at 549. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs. *Id.* at 603, 454 A.2d at 550.

In this case, although there was testimony from a medical examiner regarding the condition of the victims' bodies, admission of the photos was well grounded. The vast majority of photos offered by the prosecution were excluded from evidence. The few that were admitted served to provide the jury with a better understanding of the crime scene. They also exposed the exceedingly malicious manner in which the murders were committed. By allowing the jurors to gain insight into the full extent of the harm wrought, the jurors were placed in a better position to assess the nature and intent of the crime's perpetrator. A jury can often best perform its function if it has not been unduly insulated from gaining a full understanding of the crime itself. The photos in the present case served to enhance that understanding.

Further, the photos, by depicting the massive number of wounds inflicted on Tammy Mock, bolstered the prosecution's theory that the killings were intentional, thereby countering

the defense claim that appellant just briefly "lost control" and attacked his victims without a specific intent to kill.

The photos had additional evidentiary value in that there was a dispute regarding the weapons used against Tammy Mock. While the prosecution and defense agreed that many of her wounds had been inflicted with a knife, the defense contested the prosecution's evidence that the claw end of a hammer had also been utilized. By seeing pictures of the wounds, the jury was better able to draw inferences about the weapons employed.

Our review of the record, and of the photos themselves, reveals that the trial court carefully exercised its discretion to limit the number and type of photos shown to the jury so as to minimize any possibility of prejudice to appellant. No error was committed.

■ Appellant next contends that the trial court erred in allowing the prosecution to ask its expert witness, a forensic pathologist, to state the manner in which the victims died. The pathologist had already stated the causes of death, to wit, that Tammy Mock died of stab wounds and that Holly Jacobs drowned. When the prosecution attempted to elicit an opinion regarding the manner of death, however, the defense objected on the basis that the manner of death was for the jury rather than the expert to determine.

The jury was sent out of the courtroom, and the pathologist was questioned regarding his opinion. He stated that both deaths were "homicides" and that he was using the term "homicides" in a medical rather than legal sense, meaning only that the deaths were not self-inflicted. Defense counsel indicated that he did not object to testimony that Tammy Mock's death was a homicide, but objected to testimony that the death of the infant, Holly Jacobs, was a homicide. The jury was then brought back to the courtroom and the expert testified that both of the victims' deaths were, in a medical sense, homicides. To eliminate the possibility of any misunderstanding, he testified further that "[t]he medical definition of homicide is that the person could not have done it to himself or

herself and in order for this to have occurred it involves the intervention of another human being."

To no extent did the expert indicate that homicides, in a legal sense, were involved. The expert's testimony established only that the victims did not succumb to self-inflicted causes of death. This can only be taken to mean that Tammy Mock did not intentionally or accidentally stab herself 200 times, and that Holly Jacobs, the baby, did not commit suicide or accidentally climb into the bathtub and drown.

No prejudice could have accrued from this testimony. Appellant's own testimony was that he fatally stabbed Tammy Mock. Hence, appellant did not take the position that Mock's wounds were self-inflicted; the expert's opinion that the wounds were not self-inflicted was therefore harmless to appellant's case.

Similarly, the expert's opinion that Holly Jacobs' death was not self-inflicted was consistent with appellant's case. Appellant did not take the position that the baby committed suicide or that she drowned herself accidentally. Appellant testified at trial that he placed Holly into the tub of water and that Tammy Mock, who was already in the tub, drowned her. This testimony was, of course, inconsistent with the admission he made to his mother that he killed both victims. Nevertheless, whether appellant admitted that he drowned the baby or claimed that Tammy Mock did so instead, the fact remains that no one took the position that the baby inflicted her own drowning. Hence, the expert's opinion that the baby's death was not self-inflicted was harmless to appellant's case.

Further, during its charge to the jury, the court very clearly instructed that the expert's opinion regarding homicide in a medical sense was not to be construed as an opinion regarding homicide in a legal sense. The court stated:

[T]he question the witness was being asked was about whether this was a homicide in the medical sense, which is entirely different from the question you're being asked to decide, which is, is this homicide in a legal sense as I'm about to define it for you.... [D]on't be confused by that.

When the Doctor said homicide, he was talking medically and totally a different question from what you're being asked to decide.

In short, therefore, allowing the pathologist to give his opinion regarding the manner of death was not prejudicial to the defense.

■ The next claim raised by appellant is that the trial court erred in excusing a juror who became ill on the last day of trial. Appellant contends that the court dismissed the juror in a "quick fashion" without first having obtained adequate information about the illness.

■ The discharge of a juror is within the sound discretion of the trial court. Absent a palpable abuse of that discretion, the court's determination will not be reversed. *Commonwealth v. Black,* 474 Pa. 47, 56, 376 A.2d 627, 632 (1977).

The juror in question called in sick on the final day of trial. Upon being informed of this, the court made a phone call to the juror while the prosecutor, defense counsel, and stenographer were present. The juror stated that he had a pre-existing heart condition, that he was experiencing nausea, and that he was physically unable to participate in the trial that day. He also stated that he had an appointment to see a doctor later that day. The court excused the juror with the requirement that the juror provide a note from his doctor after his appointment. The juror's place was taken by the first alternate juror. Later, the court received the requested note from a doctor confirming the juror's illness.

We perceive nothing improper in the court's handling of this matter. No abuse of discretion occurred in excusing the juror.

■ It is next argued by appellant that the trial court erred by allowing into evidence two prior statements of a prosecution witness, Delois Jacobs. Delois Jacobs, appellant's mother, was called as a witness regarding a telephone conversation that she had with appellant shortly after the crime. She testified that appellant told her that he killed Tammy

Mock. She also testified that she was "not quite sure" what appellant said regarding the baby, Holly Jacobs. Surprised by this claimed uncertainty, the prosecutor introduced as substantive evidence portions of two prior statements that Delois Jacobs had given. One was a transcript of a tape recorded statement given to the police. The other was testimony from appellant's preliminary hearing. In these statements, Delois Jacobs said that appellant admitted during the telephone conversation that he killed both victims, and that, when asked why he killed the baby, appellant replied, "Mommy, because I didn't want Tammy's family to have her."

The trial court permitted the statements to be introduced on the basis that they were prior inconsistent statements admissible as substantive evidence under *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986) (substantive use of prior inconsistent statements of a non-party witness who is present in court and subject to cross-examination). Accord *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992). Delois Jacobs testified that both of the prior statements were accurate records of what she had said.

Appellant contends, however, that the statements were not in fact inconsistent with the trial testimony given by Delois Jacobs, and that the statements should not, therefore, have been admitted into evidence. We do not agree.

At trial, Delois Jacobs testified that she was emotionally upset at the time of the telephone conversation and that she may not, therefore, have accurately understood what appellant said. Testimony that she lacked a reliable understanding of what appellant said regarding the death of the baby was indeed inconsistent with her earlier statements. By making the earlier statements, she purported to have accurately understood and recounted the admissions made by appellant. Hence, there was a plain inconsistency between the statements and the trial testimony as to whether Delois Jacobs accurately understood appellant's admissions. The prosecutor's use of the prior inconsistent statements was, therefore, proper. See *Commonwealth v. Reid*, 533 Pa. 508, 514–15, 626 A.2d 118, 121 (1993).

█ The next argument raised by appellant is that the court erred in its charge during the penalty phase. In its charge, the court described general principles of law and then provided definitions of mitigating and aggravating circumstances. Appellant asserts that aggravating circumstances should not have been the final matter defined, as this caused undue attention to be focused thereon. Appellant contends that aggravating circumstances should have been defined before general principles of law were discussed, or, at the very least, before mitigating circumstances were defined. This contention is patently without merit.

█ A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error. See *Commonwealth v. Prosdocimo*, 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990).

█ There is no basis to believe that whatever is defined last in a charge is given undue attention by the jury. In addressing the various elements of a charge, the court obviously must place something first and something last. If the court had discussed aggravating circumstances as its first item, appellant might now be asserting that placing it first caused it to receive undue emphasis. In short, the order in which the elements of a charge are set forth is not critical, so long as the charge as a whole fairly conveys the applicable principles of law. Examination of the present charge reveals that the aggravating circumstances were described for the jury without any undue emphasis being placed thereon. Hence, the court did not err.

In returning a verdict of death for the murder of Tammy Mock, the jury found that there were one or more aggravating circumstances which outweighed any mitigating circumstances, 42 Pa.C.S. § 9711(c)(1)(iv). The aggravating circumstances were that the murder was committed by means of torture, 42 Pa.C.S. § 9711(d)(8), and that appellant had been

convicted of another murder committed either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). The mitigating circumstances were that appellant was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2), and that there was other evidence of mitigation concerning his character and record and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8).

The facts of this case clearly support the jury's finding that the murder of Tammy Mock was committed by means of torture. We have defined torture, for purposes of 42 Pa.C.S. § 9711(d)(8), as an intentional infliction of "a considerable amount of pain and suffering on the victim which is unnecessarily heinous, atrocious or cruel, manifesting exceptional depravity." *Commonwealth v. Thomas*, 522 Pa. 256, 277, 561 A.2d 699, 709 (1989). Appellant inflicted numerous blunt force injuries on Mock in addition to more than 200 stab wounds. The wounds covered many areas of Mock's body, including areas where no vital body parts were located. A substantial number of the stab wounds were shallow in depth and were positioned where they would not be expected to cause a rapid death, for example on Mock's face, hands, arms, shoulders, buttocks, etc. This, as well as the sheer number of wounds inflicted, provides ample basis for belief that appellant intentionally inflicted a considerable amount of pain and suffering and that his actions manifested exceptional depravity.

The jury's finding that appellant was convicted of another murder committed before or at the time of the offense at issue was likewise well founded, given appellant's conviction for the murder of Holly Jacobs. The record, therefore, fully supports the jury's findings as to aggravating circumstances. See 42 Pa.C.S. § 9711(h)(3)(ii).

■ In accordance with our duty, under 42 Pa.C.S. § 9711(h)(3)(iii), to review sentences of death from the standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. at 63, 454 A.2d at 961, we have reviewed the sentence imposed upon appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. See *Common-*

*wealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), cert. denied, 469 U.S. 963 (1984). We perceive no excess or disproportionality in the sentence imposed. Further, the record does not provide any basis for belief that the sentence was the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, the sentence of death, as well as the sentence of life imprisonment, must be affirmed.

Judgments of sentence affirmed.*

LARSEN, J., did not participate in the decision of this case.

MONTEMURO, J., who was an appointed Justice of the Court at the time of argument, participated in the decision of this case in his capacity as a Senior Justice.

---

* The Prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor, 42 Pa.C.S. § 9711(i).