715 A.2d 1086

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Peter Michael KARENBAUER, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 10, 1998.

Decided July 22, 1998.

Randall T. Hetrick, for appellant.

William Panella, New Castle, Robert A. Graci, Harrisburg, for Com., appellee.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION

SAYLOR, Justice.

Appellant, Peter Michael Karenbauer, was convicted of murder in the first degree by a jury in the Court of Common Pleas of Lawrence County. The victim of the crime was eight-year-old Lacy Johnson, daughter of the woman with whom Karenbauer lived. At the penalty phase of the trial, the jury returned a sentence of death. Following the filing and denial of Karenbauer's post-sentence motions *nunc pro tunc,* this direct appeal ensued. We affirm.

The record reveals that on July 16, 1995, Karenbauer, accompanied by Lacy, drove Nita Johnson, Lacy's mother, to her place of employment and then returned home. When Karenbauer arrived to pick up Nita at the end of her shift, he told her that Lacy was staying with her maternal grandparents and that he would take her (Nita) out for the evening. Karenbauer and Nita spent the night in a motel.

Returning to their home the next morning, both Karenbauer and Nita fell asleep in the downstairs living room. Nita's son, Michael Johnson, arrived around noon and told his mother that her parents, with whom he often stayed, were outside in their van. At that point Karenbauer told Nita that in fact Lacy was not with her grandparents but rather that he had allowed her to leave with her father, Nita's husband. Fearing that her husband had kidnapped Lacy, Nita went outside to talk with her parents. When she returned to the house, Karenbauer was no longer there. Nita and her son went upstairs. As Nita was looking out a bedroom window, trying to spot Karenbauer, Michael said that there were blankets under the bed. The "blankets" turned out to be Lacy's body, wrapped in a blanket and dressed in wet, blood-soaked cloth-

ing. A knife handle was found on top of the bed, and the knife blade, which had apparently been snapped off, was later found between the mattress and box springs in the master bedroom. In addition, there were bloodstains on the floor and walls of the room in which Lacy's body was found, as well as in the bathtub.

Following the discovery of the body, police officers searched for Karenbauer. New Castle Police Chief Charles Abraham testified that as he and Lieutenant Gagliardo were driving through the neighborhood, they spotted a man who fit Karenbauer's description, and Chief Abraham asked, "[A]re you Mike?" Karenbauer answered, "[Y]es, I know, I murdered somebody." Karenbauer then got into the patrol car and was read his *Miranda* rights. When asked whether he wanted to tell what had happened, Karenbauer replied that Lacy "got mouthy" and that he stabbed her "a lot" of times and then held her under water.

At the police station, Detective Sergeant Thomas Sansone gave Karenbauer a second *Miranda* warning. Karenbauer then made a statement, which was reduced to writing and signed, and which read in pertinent part as follows

Me and Lacy went swimming in our pool in the backyard. Me and Lacy got into an argument in the swimming pool. We went into the house and were still arguing. We went upstairs to change clothes. The next thing I remember was that I was holding Lacy under water in the bathtub. I saw blood covering Lacy and the water was bloody also. I wiped the blood off of my arms with a towel. I don't remember stabbing Lacy but I saw her bleeding from her chest area while I had her in the tub. I left Lacy in the tub and I got changed, and left the house....

Early the next morning, July 17, 1995, [Nita and I] left the motel and went home to Morris Street. I went upstairs to the bathroom and I saw Lacy still lying in the tub. The water was out of the tub and there was blood all over. I got a blanket from Mike's room and put the blanket on the floor and took Lacy from the tub and put her in the blanket. When I picked Lacy up, blood ran all over the floor. I took

Lacy into Mike's room and put her under the bed. I went back to the bathroom and cleaned the blood up. I took the towels and rags and put them under Mike's bed. I found a knife blade in a pool of blood in Mike's room. I picked the blade up and covered the pool of blood with a basket. I took the knife blade to my bedroom and put it under my mattress.... I then took a shower to get the blood off of me.

Karenbauer's confession was read into evidence at trial; Karenbauer did not testify during the guilt phase of the proceeding.

A Commonwealth witness, Detective Sergeant Cynthia Eve of the New Castle Police, testified that during a recess in a pre-trial proceeding she heard Karenbauer, who was in a private room about 15 feet from her, shouting "I did it, I don't know why I did it, nobody can tell me why I did it.... They should just shoot me." She described Karenbauer as crying and upset.

According to Dr. James Smith, the pathologist who conducted the autopsy, Lacy sustained 18 knife wounds, some of which were defensive in nature, and none of which was fatal by itself. The cause of death, in Dr. Smith's opinion, was the combination of hemorrhage from the multiple knife wounds, partial asphyxia caused by the collapse of the right lung as the result of a stab wound, and asphyxia caused by drowning. Forensic testimony established that the blood on the knife blade found in the master bedroom carried a genetic marker that was consistent with Lacy's blood.

Karenbauer did not deny that he killed Lacy. Instead, he presented a diminished capacity defense, asserting that he could not be guilty of murder in the first degree because he had been unable to form a specific intent to kill.

To support his claim, Karenbauer offered the testimony of Dr. Lawson Bernstein, a forensic neuropsychiatrist. Dr. Bernstein opined that Karenbauer suffered from moderate mental retardation, a history of injury to the frontal lobes of the brain, and severe depression, all of which combined to

diminish severely his capacity to premeditate, deliberate, and form a specific criminal intent.

Dr. Bernstein's opinion was challenged by the Commonwealth's expert, Dr. Christine Martone, a staff psychiatrist at the State Correctional Institution at Pittsburgh and a specialist in the treatment of mentally ill offenders. In her opinion, Karenbauer's mental retardation was mild rather than moderate, his diagnosis was that of borderline personality disorder, and, at the time in question, he was able to form a specific intent to kill.

The jury convicted Karenbauer of murder in the first degree. At the penalty hearing, the Commonwealth offered two aggravating circumstances: 1) the crime had been committed by means of torture; and 2) the victim of the crime was under the age of 12. As possible mitigating circumstances, Karenbauer offered the following: 1) the substantial impairment of his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law; 2) his age at the time of the crime (25); and 3) other evidence regarding his character and record, including his learning disabilities, mild mental retardation, mental illness, and remorse, as well as his broken family, his stepfather's drug and alcohol problems, and the physical and mental abuse that he had sustained at the hands of his stepfather.

The jury found two mitigating circumstances (mild mental retardation, physical and mental abuse) and both aggravating circumstances proffered by the Commonwealth. Finding that the latter outweighed the former, they returned a sentence of death.

## SUFFICIENCY OF THE EVIDENCE

We address, first, Karenbauer's claim that the evidence was insufficient to sustain the conviction of first degree murder. As this is a capital case, we are required to review the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The applicable standard of review is whether, viewing all of

the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Edmiston,* 535 Pa. 210, 221, 634 A.2d 1078, 1083 (1993).

■ Murder of the first degree is a criminal homicide committed by an intentional killing. 18 Pa.C.S. § 2502(a). To prove the offense, the Commonwealth must demonstrate that the defendant acted with a specific intent to kill. *Commonwealth v. Auker,* 545 Pa. 521, 539, 681 A.2d 1305, 1315 (1996). The Commonwealth must show: 1) that a human being has unlawfully been killed; 2) that the defendant did the killing; and 3) that the killing was done in an intentional, deliberate, and premeditated manner. *Id.*

■ Karenbauer does not deny that Lacy was unlawfully killed or that he killed her. He argues, rather, that he and Lacy enjoyed a very good relationship and that the Commonwealth provided no evidence to show premeditation or deliberation on his part prior to the moment of Lacy's death. Therefore, Karenbauer contends, the Commonwealth did not prove beyond a reasonable doubt that he possessed the specific intent necessary to sustain a conviction of first degree murder. At most, Karenbauer argues, the Commonwealth's evidence supported a verdict of murder in the third degree.

■ Karenbauer's argument is without merit. The specific intent to kill can be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Hall,* 549 Pa. 269, 282, 701 A.2d 190, 196 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998); *Commonwealth v. Rios,* 546 Pa. 271, 281, 684 A.2d 1025, 1030 (1996), *cert. denied,* —— U.S.——, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997). If the defendant knowingly applied deadly force to the victim, his specific intent to kill is as evident as if he expressed the intent to kill at the time the force was applied. *Auker,* 545 Pa. at 539, 681 A.2d at 1315; *Edmiston,* 535 Pa. at 221, 634 A.2d at 1083–84. The period of premeditation necessary to form the specific intent to kill may

be very brief. *Commonwealth v. Robinson,* 468 Pa. 575, 583, 364 A.2d 665, 669 (1976).

In his statements to the police, Karenbauer admitted that he and Lacy began to argue in the swimming pool, that they continued to argue as they went into the house, and that Lacy "got mouthy." Karenbauer then got a knife and stabbed Lacy 18 times, penetrating the pericardium (the covering of the heart), the pleural cavity (the area surrounding the lungs), and the right lung. The evidence is also sufficient to establish that, when this assault did not prove fatal, Karenbauer carried Lacy to the bathtub, filled the tub with water, and held Lacy under water until she died.

## GUILT PHASE

### Pre–Trial

Karenbauer challenges several rulings made by the trial court prior to trial. First, he contends that the trial court abused its discretion in failing to grant his request for a change of venue or venire.

A request for a change of venue or venire is addressed to the sound discretion of the trial court, which is in the best position to assess the atmosphere of the community and to judge the necessity of the requested change. *Commonwealth v. Chambers,* 546 Pa. 370, 385, 685 A.2d 96, 103 (1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997); *Commonwealth v. Tedford,* 523 Pa. 305, 323, 567 A.2d 610, 618 (1989). Absent an abuse of discretion, the trial court's decision will not be disturbed. *Chambers,* 546 Pa. at 385, 685 A.2d at 103; *Tedford,* 523 Pa. at 323, 567 A.2d at 618.

A change of venue becomes necessary when the trial court determines that a fair and impartial jury cannot be selected in the county in which the crime occurred. *Commonwealth v. Stevens,* 543 Pa. 204, 209, 670 A.2d 623, 625, *cert. denied,* —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); *Commonwealth v. Birdsong,* 538 Pa. 587, 596, 650 A.2d 26, 31 (1994). Karenbauer argues that the trial court should have made such a determination in the present case, as the case, involving as it did the heinous death of an 8–year–old child,

was extremely newsworthy in the New Castle area. Ordinarily, however, a defendant is not entitled to a change of venue unless he or she can show that pre-trial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. *Commonwealth v. Rucci,* 543 Pa. 261, 283–84, 670 A.2d 1129, 1140 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997); *Birdsong,* 538 Pa. at 596, 650 A.2d at 31; *Tedford,* 523 Pa. at 323, 567 A.2d at 618. The mere existence of pre-trial publicity does not warrant a presumption of prejudice. *Chambers,* 546 Pa. at 385, 685 A.2d at 103; *Tedford,* 523 Pa. at 324, 567 A.2d at 619.

There is an exception to the requirement that the defendant demonstrate actual prejudice. Pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual or objective; that such publicity revealed the defendant's prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or that it was derived from official police and prosecutorial reports. *Chambers,* 546 Pa. at 385, 685 A.2d at 103; *Birdsong,* 538 Pa. at 597, 650 A.2d at 31; *Commonwealth v. Breakiron,* 524 Pa. 282, 287–88, 571 A.2d 1035, 1037, *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990); *Tedford,* 523 Pa. at 324, 567 A.2d at 619. Even if the defendant proves the existence of one or more of these circumstances, a change of venue or venire is not warranted unless he or she also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. *Chambers,* 546 Pa. at 385, 685 A.2d at 103; *Breakiron,* 524 Pa. at 288, 571 A.2d at 1037.

Karenbauer attempts to bring his claim of error within this exception by making the bald assertion that the pre-trial publicity in this case was extensive and, because of the age of the victim, sensational and slanted toward convic-

tion. Karenbauer's argument is totally lacking in specificity.
The only reference to the precise nature of the publicity in
question is the statement that Karenbauer provided the trial
court with tapes from local television broadcasts and tran-
scripts from local newspapers. Karenbauer does not identify
any particular language in these tapes and transcripts as
sensational or slanted; indeed, the specific tapes and tran-
scripts themselves are not identified. These boilerplate alle-
gations do not entitle Karenbauer to relief. *Birdsong*, 538 Pa.
at 597, 650 A.2d at 31.

Moreover, although the record includes a number of news-
paper articles and television broadcast transcripts that re-
ferred to police reports of Karenbauer's confessions and/or to
Karenbauer's prior criminal record, we cannot conclude that
the publicity concerning the case was so extensive, sustained,
pervasive, and continuing that the community must be deemed
to have been saturated with it. Of the 86 prospective jurors in
the general jury pool, 57 were questioned about their knowl-
edge of the case; the remaining 29 were excused for various
reasons before such questioning became necessary. Of the 57
questioned, 13 could not recall having heard anything about
the case, and four of those persons were chosen as jurors.
Five of the 57 had heard something about the case from
others; three of those five were chosen as jurors. Eleven of
the 57 had read the initial newspaper coverage of the case,
which appeared approximately a year before trial, but nothing
since that time; one of the 11 was seated on the jury. Three
of the 57 had seen only recent coverage, and another 11 had
read the initial coverage and more recent coverage as well.
Two of the latter 11 were selected as jurors. The responses of
the remaining 14 persons are not easily categorized; all had
heard something about the case from various sources, some of
which were not specified. Two of this group were seated as
jurors.

Focusing in greater detail on the persons chosen as jurors,
four had heard nothing of the case prior to trial; two had
known only that the crime involved was murder; one had
heard of the case only through "small talk"; one had read only

"basic information" about the case in the newspaper a year earlier; two had read the initial coverage of the case, as well as an article concerning jury selection that appeared in the New Castle News on the weekend prior to trial;[1] one had read the jury selection article, as well as unspecified earlier coverage; and one had learned from the New Castle News, "not recently," that the central allegation in the case was that Karenbauer had murdered a little girl. None of the 12 claimed any substantial knowledge of the case, and each affirmed that he or she had not formed an opinion as to Karenbauer's guilt or innocence.

Under these circumstances, we conclude that Karenbauer has failed to meet his burden of proving that the media coverage of his case prejudiced his ability to obtain a fair and impartial jury. Accordingly, the trial court did not abuse its discretion in denying Karenbauer's motion for a change of venue or venire. *See generally Rucci,* 543 Pa. at 284–85, 670 A.2d at 1140–41 (acknowledging potentially prejudicial nature of several articles cited by defendant, but affirming denial of motion for change of venue or venire based upon voir dire responses establishing lack of prejudice).

 Next, Karenbauer contends that the trial court erred in denying the motion of his court-appointed attorney, Randall Hetrick, made at Karenbauer's request, to withdraw due to a conflict of interest.[2] The alleged conflict of interest resulted from Attorney Hetrick's representation of one Wayne Brabson. Karenbauer allegedly confessed to Brabson, while the two were incarcerated together, that he had committed the murder. Attorney Hetrick was appointed to represent Karenbauer on October 16, 1995; he was permitted to withdraw as counsel for Brabson on October 20, 1995. At a pre-trial hearing on June 13, 1996, before the Honorable Glenn McCracken, Jr., the prosecutor stated that he would not call Brabson as a witness if, as he expected, Karenbauer's pending motion to suppress his inculpatory statements to the police

---

1. The concluding paragraph of the article mentioned Karenbauer's confessions and cited the police as the source of the information.

2. Mr. Hetrick continues to represent Karenbauer in this appeal.

was denied. Later that same day, the Honorable Dominick Motto denied the suppression motion. Finding no conflict of interest, the trial court denied Attorney Hetrick's motion to withdraw.

Karenbauer cites the Superior Court's decision in *In re Saladin*, 359 Pa.Super. 326, 518 A.2d 1258 (1986), for the proposition that an actual conflict of interest exists whenever, during the course of representation, there is a divergence between the interest of the defendant and the interest of another client toward whom defense counsel bears obligations with respect to a material factual or legal issue or to a cause of action. *Id.* at 332, 518 A.2d at 1261. According to Karenbauer, such an actual conflict of interest did exist during the period when it appeared "that a prior client [of Attorney Hetrick] could possibly testify against [Karenbauer]...." Therefore, he argues, the trial court should have allowed Attorney Hetrick to withdraw and appointed new counsel "[a]s an exercise of caution...." We disagree.

Attorney Hetrick's concurrent representation of Brabson and Karenbauer lasted for no more than five days. From that point forward, Attorney Hetrick was in the position of having a former client who might be called to testify against a current client, Karenbauer. Even that possibility evaporated prior to trial when the Commonwealth declared that it would not call Brabson as a witness. A defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice. *Commonwealth v. Faulkner*, 528 Pa. 57, 77, 595 A.2d 28, 38 (1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). Where, as here, the record clearly demonstrates that counsel did not actively represent conflicting interests, a claim based on the appearance of a conflict of interest lacks merit. *See Commonwealth v. Smith*, 380 Pa.Super. 619, 629–30, 552 A.2d 1053, 1059 (1988), *appeal denied*, 525 Pa. 581, 575 A.2d 112 (1990).

Finally, Karenbauer contends that the trial court erred in sustaining the Commonwealth's objection to Karenbauer's proposed voir dire question concerning whether any

potential juror belonged to a victims' rights organization. The failure to ask the proposed question, Karenbauer argues, may have resulted in the seating of one or more jurors who were not impartial owing to unknown biases. Karenbauer maintains that he is entitled to a new trial so that proper voir dire questioning may take place.

The scope of voir dire rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. *Commonwealth v. Proctor*, 526 Pa. 246, 257, 585 A.2d 454, 460 (1991). The purpose of voir dire is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. *Id.*; *Commonwealth v. England*, 474 Pa. 1, 6, 375 A.2d 1292, 1295 (1977). The scope of voir dire should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. *England*, 474 Pa. at 7, 375 A.2d at 1295. "A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court." *Id.* at 8, 375 A.2d at 1296.

Thus, a trial court does not abuse its discretion in refusing to allow counsel to question prospective jurors concerning racial bias where there are no special circumstances, other than the different races of the defendant and the victim, which make the case racially sensitive, *see Commonwealth v. Marrero*, 546 Pa. 596, 608–09, 687 A.2d 1102, 1108 (1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997); in refusing to allow counsel to ask prospective jurors whether they privately agree with fundamental concepts of criminal law, such as the defendant's right to remain silent, *see England*, 474 Pa. at 8, 375 A.2d at 1296; or in refusing to allow counsel for the defendant in a rape trial to ask prospective jurors whether they or close friends or relatives had ever been members of groups such as Women Organized Against Rape, *see Commonwealth v. Myers*, 376 Pa.Super. 41, 48, 545 A.2d 309, 312 (1988).

In the present case, there were no special circumstances that would have warranted inquiry into potential jurors' possible affiliation with a victims' rights group. Indeed, Karenbauer does not even attempt to argue that such circumstances existed. All of the jurors swore that they were capable of accepting and applying the law as instructed by the court, regardless of any preconceptions they may have had. The court was entitled to assume, absent some indication to the contrary, that the jurors would not violate their oath. *See England,* 474 Pa. at 8, 375 A.2d at 1296. Accordingly, the trial court did not abuse its discretion in disallowing the proposed voir dire question.

**Trial**

First, Karenbauer contends that the trial court erred in allowing the Commonwealth to introduce into evidence, during its cross-examination of Nita Johnson, a custody order pursuant to which Karenbauer had been forbidden to have any contact with Lacy. The Commonwealth offered the evidence to challenge the credibility of Nita's statements that she, Karenbauer, and Lacy had lived together for two years prior to Lacy's death and that Lacy and Karenbauer had always gotten along well.

According to Karenbauer, evidence of the custody order was irrelevant, as the mere fact of the order's existence did not establish that Nita had followed the order. Moreover, Karenbauer argues, the evidence was prejudicial, as the jury was likely to infer that the order had been entered because he had abused Lacy at some time in the past; he denies ever having done so. Although the trial court cautioned the jury that the evidence should be considered only for purposes of impeachment, Karenbauer contends that the cautionary instruction was insufficient to dispel the prejudice that would have resulted from admission of the evidence.

The scope of cross-examination lies largely within the discretion of the trial court, whose ruling will not be reversed absent a clear abuse of discretion or error of law. *Commonwealth v. Snoke,* 525 Pa. 295, 305, 580 A.2d 295, 300

(1990). As a general rule, a party is entitled to bring out on cross-examination every circumstance relating to the fact that the adverse witness has been called to prove. *Commonwealth v. Green,* 525 Pa. 424, 454, 581 A.2d 544, 558 (1990). In criminal cases, the right of cross-examination extends not only to the matters testified to on direct examination, but also to any facts tending to refute inferences or deductions arising from those matters. *Id.* at 454, 581 A.2d at 558–59. With regard to credibility, a witness may be cross-examined as to inconsistent acts or conduct or omissions that tend to discredit his or her testimony. *Id.* at 454, 581 A.2d at 559.

The trial court carefully applied these principles to the facts of the present case.

> In the case *sub judice,* the testimony of the victim's mother to the effect that the victim and Defendant had a longstanding relationship on good terms was clearly aimed at permitting the jury to draw an inference that Defendant lacked the motive and, perhaps, the intent to kill the victim. Under the holding of *Green,* this inference may be attacked on cross-examination. It is simply not arguable that the prior order forbidding contact between the victim and Defendant has no probative value for impeachment purposes. As the Commonwealth notes, the prior order is clearly of paramount importance in assessing the witness' ability to observe the very relationship to which she testified. Under these circumstances, it is difficult to imagine a piece of evidence more crucial to the jury's determination of the witness' credibility. . . .

Opinion of July 18, 1997, Denying Post–Sentence Motions. We agree. Whether Nita Johnson did in fact comply with the custody order was a matter to be explored through further questioning.[3]

■ Relevant evidence may nevertheless be excluded if its probative value is outweighed by the unfair prejudice that

---

**3.** On recross-examination, Nita Johnson conceded that the order had been in effect for approximately two years and that during that period Lacy and Karenbauer basically did no more than cross paths as the one arrived at Nita's home and the other departed.

would result from its admission. *Green*, 525 Pa. at 455, 581 A.2d at 559. Karenbauer contends that the trial court erred in not excluding evidence of the custody order in this case, as he was unfairly prejudiced by the unstated implication of child abuse, and he also asserts that the trial court's cautionary instruction came too late to cure such prejudice.

Karenbauer's claim is meritless. After the Commonwealth had questioned Nita concerning the existence of the order and the period of time during which it was in effect, the court instructed the jury that evidence of the order was admitted for the sole purpose of testing the veracity of Nita's assertion that she, Karenbauer, and Lacy had been together for two or three years. The court specifically instructed the jury not to speculate as to the reason why the order was entered and not to conclude that Karenbauer must have abused Lacy, there being no evidence of abuse. The court included a similar instruction in its general charge to the jury at the close of trial. These instructions were more than sufficient to cure any prejudice to Karenbauer. A jury is presumed to have followed a limiting instruction, *Commonwealth v. LaCava*, 542 Pa. 160, 175–76, 666 A.2d 221, 228 (1995), and Karenbauer has given us no reason to doubt that the jury did so in the present case.

Next, Karenbauer contends that the trial court erred in allowing Dr. James Smith, the forensic pathologist, to testify that, in his opinion, none of the stab wounds inflicted on Lacy would have rendered her unconscious prior to her drowning. Karenbauer argues that since he had admitted to the homicidal act, the testimony concerning unconsciousness, while possibly relevant to the question of torture in the penalty phase of trial, was irrelevant to the question of whether Karenbauer should be convicted of first or of third degree murder.

Karenbauer's argument on this issue is devoid of any citations to the notes of testimony or to case law. Nevertheless, we are able to review this claim and to conclude that it does not entitle Karenbauer to relief. As noted by the trial court,

the critical issue in the case was whether Karenbauer had acted with the specific intent to kill. "If the victim was still conscious at the conclusion of the stabbings, then the immersion in the water takes on a crucial role in showing [Karenbauer's] specific intent to kill. . . ." Accordingly, the trial court did not abuse its discretion in allowing Dr. Smith to testify concerning the victim's state of consciousness. *See LaCava*, 542 Pa. at 174, 666 A.2d at 227 (setting forth the abuse of discretion standard of review).

In his next issue, Karenbauer contends that the trial court erred in admitting into evidence six black-and-white photographs of the victim's corpse, taken during the autopsy. Five of the photographs showed knife wounds to various areas of the body, including the neck, chest, and back; the sixth photograph was of the lower right leg and foot, and showed wrinkling of the skin consistent with immersion in water. Karenbauer argues that the photographs were clearly inflammatory and of minimal evidentiary value in light of the fact that he had admitted killing Lacy.

 "Photographs of a murder victim are not *per se* inadmissible." *Commonwealth v. Chester*, 526 Pa. 578, 591, 587 A.2d 1367, 1373, *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991) (citations omitted). Rather, it is the manner in which the body of the victim is displayed that causes photographs to be emotionally charged. *Id.* Concerning admissibility, "[t]he determinative inquiry is whether the photos have evidentiary value that outweighs the possibility of inflaming the minds and passions of the jurors." *Commonwealth v. Jacobs*, 536 Pa. 402, 406–07, 639 A.2d 786, 788 (1994). The trial court's decision in the matter will not be reversed absent an abuse of discretion. *Id.* at 406, 639 A.2d at 788.

It is well established, and of particular importance to our analysis, that photographs of the victim's wounds may be relevant to show the assailant's intent to kill. *Id.* at 407, 639 A.2d at 789; *Commonwealth v. Garcia*, 505 Pa. 304, 314, 479 A.2d 473, 478 (1984); *Commonwealth v. McCutchen*, 499 Pa. 597, 602, 454 A.2d 547, 549 (1982). "In assessing the intent of

the actor in a case of criminal homicide, ... the fact finder who deals in such an intangible inquiry must be aided to every extent possible." *McCutchen,* 499 Pa. at 602, 454 A.2d at 549. Accordingly, the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant. *Jacobs,* 536 Pa. at 407, 639 A.2d at 789; *McCutchen,* 499 Pa. at 603, 454 A.2d at 550.

■ At trial the court found that two of the six photographs were not inflammatory. One of the two shows wounds to the upper right shoulder and the mid-back; the other shows the condition of the right foot and lower leg. Having examined these photographs, we agree with the trial court that they were not inflammatory. Therefore, as the photos were clearly relevant to enhance the jury's understanding of the nature of Karenbauer's attack on the victim, they were admissible.

■ The court found the remaining photographs to be inflammatory,[4] but possessed of evidentiary value sufficient to warrant their admission. Again, based on our examination of the photographs, we agree. The photographs illustrate the severity of Karenbauer's attack on the victim. For that reason, they are decidedly unpleasant to view. Also for that reason, they tend to prove that Karenbauer attacked the victim with the specific intent to kill her. *See Chester,* 526 Pa. at 592–93, 587 A.2d at 1374 (finding that a color photo depicting gaping neck wound was inflammatory, but admissible because relevant to negate defendant's claim that altercation resulted in victim's unintended death); *Garcia,* 505 Pa. at 314, 479 A.2d at 478 (photo showing bloodied body of murder victim was potentially inflammatory, but admissible because

4. A photograph that is deemed inflammatory (that is, tending to inflame the minds and passions of the jury) may nevertheless be admitted if it possesses "such essential evidentiary value" that the need for it outweighs the likelihood that it will have such an effect on the jury. *Auker,* 545 Pa. at 544–45, 681 A.2d at 1318 (quoting *McCutchen,* 499 Pa. at 602, 454 A.2d at 549). In its opinion denying post-sentence motions, the trial court indicated that the photographs were not so gruesome as to be characterized as inflammatory. We will accept the court's observations at trial as being the more accurate.

relevant to show ferocity of defendant's attack, which in turn tended to prove premeditation and deliberation); *see also Jacobs*, 536 Pa. at 407–08, 639 A.2d at 789 (although allegedly inflammatory, photos were admissible; by depicting massive number of wounds inflicted on victim, photos bolstered Commonwealth's theory that killing was intentional and countered defendant's claim that he briefly lost control and attacked victim without intent to kill). Accordingly, the trial court did not abuse its discretion in admitting these photographs.

Next, Karenbauer contends that the trial court erred in compelling him to submit to an evaluation by a psychiatrist chosen by the Commonwealth and, further, in ruling that he had to answer the psychiatrist's questions and could not exercise his Fifth Amendment right against self-incrimination. The psychiatrist, Dr. Christine Martone, testified that in her opinion Karenbauer had been capable, at the time of Lacy's murder, of forming a specific intent to kill. During her testimony Dr. Martone referred to statements made by Karenbauer during the interview.

Karenbauer acknowledges that in *Commonwealth v. Morley*, 545 Pa. 420, 427, 681 A.2d 1254, 1258 (1996), this Court held that where a defendant has raised a mental infirmity defense, an examination by the Commonwealth's psychiatric expert (who then testified that in his opinion the defendant had been capable at the pertinent time of forming a specific intent to kill) did not violate the defendant's Fifth Amendment rights.[5] Karenbauer argues, however, that the present case is distinguishable from *Morley*. According to Karenbauer, he not only presented a diminished capacity defense, but also asserted that even if the jury rejected that defense, he was still not guilty of murder in the first degree. Given his two-prong defense, Karenbauer argues, he had the right not to be forced to give incriminating statements that could be used against him.

**5.** This Court decided *Morley* on July 29, 1996, during the course of Karenbauer's trial.

As the trial court noted, "the holding of *Morley* is not conditional[:] where a defendant places his own mental health at issue, the Commonwealth is entitled to an evaluation by its own expert." Karenbauer's argument, if accepted, would eviscerate that holding, as any defendant who asserted a defense based on his mental health could also assert that he was not guilty generally. Karenbauer's claim, therefore, does not entitle him to relief.

In his final claim arising from the guilt phase of trial, Karenbauer contends that the trial court erred in overruling his objection to the instruction to the jury that it could consider the knife wound to the victim's upper chest and the submersion of the victim in water as possible proof of a specific intent to kill. Karenbauer does not dispute the settled principle that specific intent to kill may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *See* Section I, *supra* page 6. He argues, rather, that, with the references to the chest wound and the submersion in water, the court effectively took from the jury the determination of whether Karenbauer had in fact used a deadly weapon on a vital part of the victim's body. Thus, Karenbauer argues, the court rather than the jury determined a critical fact in the case.

The trial court has broad discretion in phrasing its instructions to the jury and may choose its own wording, as long as the law is clearly, adequately, and accurately presented. *Chambers*, 546 Pa. at 382, 685 A.2d at 102. When reviewing a claim that the trial court erred in instructing the jury, we will consider the entire charge, not merely isolated fragments. *Id.*; *Rios*, 546 Pa. at 284, 684 A.2d at 1031. The verdict will not be set aside if the instruction, taken as a whole and in context, accurately sets forth the applicable law. *Commonwealth v. Bracey*, 541 Pa. 322, 335–36, 662 A.2d 1062, 1068 (1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996).

The pertinent portion of the trial court's instruction on specific intent to kill was as follows:

Now, ... if you find that deadly force was knowingly applied by the defendant to the victim, you may infer specific intent to kill is as evident as if the defendant had stated his intention to kill at the time the force was applied. Now, when deciding whether [the] defendant had specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind including the wounds to Lacy's upper chest caused by the knife and the submersion of Lacy in water. If you believe that the defendant intentionally used a deadly weapon, which a knife is, on the vital part of the victim's body, you may regard that as a[n] item of circumstantial evidence in which you may, if you choose, infer that [the] defendant had the specific intent to kill and had malice.

A review of the actual charge of the trial court reveals that Karenbauer has mischaracterized the pertinent portion of the instruction. The court instructed the jury that, in deciding whether Karenbauer had possessed the specific intent to kill, they were to consider any and all evidence—words, deeds, and surrounding circumstances—that might reveal Karenbauer's state of mind, including the fact that he had stabbed Lacy in the chest and held her under water. The court did *not* inform the jury that in fact Karenbauer had used a deadly weapon on a vital part of the victim's body. To the contrary, the quoted instruction is replete with reminders to the jury that they were the fact finders. When the court's instruction is fairly read in context and in its entirety, it is apparent that the court did not, as alleged by Karenbauer, impinge upon the jury's role as fact finder. Accordingly, we dismiss this claim.

## PENALTY PHASE

Karenbauer contends that the evidence offered by the Commonwealth at the penalty phase of his trial was insufficient to establish one of the two aggravating circumstances found by the jury, namely, that the crime had been committed by means of torture. For that reason, Karenbauer argues, he is entitled to a new sentencing hearing.

In order to establish the aggravating circumstance of torture pursuant to 42 Pa.C.S. § 9711(d)(8), the Commonwealth must prove beyond a reasonable doubt that the defendant intentionally inflicted on the victim a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity. *Commonwealth v. Whitney,* 550 Pa. 618, 636–38, 708 A.2d 471, 480 (1998); *Commonwealth v. Elliott,* 549 Pa. 132, 156, 700 A.2d 1243, 1255 (1997); *Commonwealth v. Cox,* 546 Pa. 515, 536, 686 A.2d 1279, 1289 (1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997).

> Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill. [*Commonwealth v. Nelson,* 514 Pa. 262,] 279–80, 523 A.2d [728,] 737[, *cert. denied,* 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987) ] (footnote omitted). Neither the efficacy of the means employed by a defendant to murder his victim nor the immediacy of death is in itself determinative of the question whether the offense was committed by means of torture. *Commonwealth v. Caldwell,* 516 Pa. 441, 448, 532 A.2d 813, 817 (1987). There must be an indication that the killer was not satisfied with the killing alone. *Commonwealth v. Edmiston,* 535 Pa. 210, 236, 634 A.2d 1078, 1091 (1993).

*Auker,* 545 Pa. at 551, 681 A.2d at 1321.

In *Auker,* the defendant forced his ex-wife into the trunk of his car, drove to a secluded wooded area, stabbed the victim seven to ten times, and left her to die. This Court concluded that the evidence was insufficient to prove that the defendant had committed the murder by means of torture. The Court found, rather, that "the acts of [the defendant], although heinous, appear to be simply the means to carry out the murder of his ex-wife." *Id.* Accordingly, the case was remanded for a new sentencing hearing.[6]

---

**6.** Because the victim's body was in an advanced state of decomposition when it was found, there was only minimal evidence concerning the nature of the victim's wounds. From holes in the clothing worn by the victim, a forensic pathologist concluded that the victim had been

■ Karenbauer contends that the facts of the present case are no worse, and in fact less heinous, than those of *Auker*, since he, unlike the defendant in *Auker*, did not allow the victim to die a slow, anguishing death, but instead immersed her in a bathtub full of water immediately after stabbing her. The trial court was not persuaded by this argument, nor are we.

> Clearly, had Defendant intended to simply kill the victim, he could have used his prohibitive size advantage and the knife in his possession to do so far more expeditiously than he actually did. Instead, he elected to cause eighteen separate wounds scattered over the victim's arms, chest, back, head and neck. All of these wounds were of the type discussed by Dr. Smith; not deep enough to cause fatal injury, but certainly deep enough to cause pain to the victim, who remained conscious throughout her ordeal. Defendant even went so far as to draw the knife across the victim's throat, but he did not cut the victim deeply enough to fatally wound her. We find this particularly significant; Defendant clearly was in a position to wound the victim fatally at the time he inflicted this wound. He elected not to do so. He did, however, at some point subsequent to inflicting stab and incision wounds upon the victim until the knife broke, elect to drown the victim. Again, we find it significant that the victim remained conscious at this point. Defendant, not satisfied with the infliction of eighteen stab and incision wounds, made a conscious decision to drown a victim who would have been aware of her immersion and impending death by drowning.

Opinion Denying Post–Sentence Motions (citations deleted).

The trial court concluded, and we agree, that the aggravating circumstance of torture was amply demonstrated by the evidence of record. *See Cox*, 546 Pa. at 536–37, 686 A.2d at 1289–90 (finding aggravating circumstance of torture established, where expert testified that both victims received several dozen stab, knife, and puncture wounds); *Stevens*, 543 Pa.

stabbed seven to ten times in the back and chest area and that the wounds would have impacted the vital organs.

at 215, 670 A.2d at 628 (same, where victim received eight gunshot wounds, none of which was capable by itself of causing death); *Commonwealth v. Lee,* 541 Pa. 260, 281, 662 A.2d 645, 656 (1995), *cert. denied,* 517 U.S. 1211, 116 S.Ct. 1831, 134 L.Ed.2d 935 (1996) (same, where defendant inflicted nine stab and slash wounds to face of one victim and six such wounds to face of another); *Commonwealth v. Rompilla,* 539 Pa. 499, 515, 653 A.2d 626, 634 (1995) (same, where victim was alive during infliction of numerous injuries, including abrasions, lacerations, blunt force injuries, fractured nose, and multiple stab wounds); *Proctor,* 526 Pa. at 260, 585 A.2d at 461 (same, where 84–year–old victim was stabbed 57 times).

Finally, Karenbauer contends that the sentence of death was contrary to the weight of the evidence in that the jury did not find mental illness as a mitigating circumstance despite the Commonwealth's concession that Karenbauer was mentally ill. As evidence of the Commonwealth's concession, Karenbauer cites the testimony of Dr. Martone, the Commonwealth's psychiatric expert, that Karenbauer suffered from a borderline personality disorder and major depressive episodes, as well as the statement made by the prosecutor during the penalty phase that Karenbauer "is mentally ill. You've heard all the diagnosis [sic], there's been no hiding of that. There's been no real dispute, maybe as to degree, but not that he had some type of mental problem." In light of the parties' agreement on the issue, Karenbauer contends, it was "totally unreasonable" that the jury did not find mental illness as a mitigating factor.

Whether a mitigating factor exists is exclusively a question for the jury. *Marrero,* 546 Pa. at 613, 687 A.2d at 1110; *Commonwealth v. Mitchell,* 528 Pa. 546, 556, 599 A.2d 624, 629 (1991). As in any other type of trial, the jury in the penalty phase of a capital trial may choose to believe all, part, or none of the evidence presented to it. *Mitchell,* 528 Pa. at 556, 599 A.2d at 629. Evidence of mental illness or impairment, when offered, is to be weighed by the jury along with all other factors, and it is for the jury to determine how much

weight should be given to such evidence. *Faulkner*, 528 Pa. at 75–76, 595 A.2d at 38. If one or more mitigating factors are found, it is also the jury's function to determine whether those factors outweigh any credible aggravating circumstances. *Marrero*, 546 Pa. at 613, 687 A.2d at 1110. Where the jury, having reviewed the evidence, concludes that no mitigating factors can be found, it is acting within its exclusive function and authority and its decision is conclusive. *Commonwealth v. Rolan*, 520 Pa. 1, 15–16, 549 A.2d 553, 560 (1988).

Karenbauer acknowledges the existing case law, but maintains that an exception should be made in the present case. We disagree. As the prosecutor noted in his comments during the penalty phase, the parties were not in complete agreement on the degree of Karenbauer's mental illness. More important, an exception to the general rule in this or any case would subvert the jury's role as fact finder. Karenbauer's claim is therefore without merit.

## INDEPENDENT REVIEW OF THE DEATH SENTENCE

██ Having concluded that Karenbauer's claims are without merit, we are required to affirm the judgment of sentence unless we determine that

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[7]

Having reviewed the record, we conclude that the sentence imposed in this case was not the product of passion, prejudice, or any other arbitrary factor. Rather, it was based upon the

---

7. By legislation enacted June 25, 1997, subsection (h)(3)(iii) providing for proportionality review and a portion of subsection (h)(4) that references such review were stricken from 42 Pa.C.S. § 9711(h). *See* Act of June 25, 1997, No. 28, § 1 (Act 28), effective immediately. However, this Court will continue to undertake proportionality review in cases where the death sentence was imposed prior to the effective

evidence that Karenbauer killed the victim with specific intent and by means of torture.

In addition, we conclude that the two aggravating circumstances found by the jury were supported by the evidence. It is undisputed that the victim was under the age of 12, and, as discussed *supra,* the evidence was sufficient to establish the aggravating circumstance of torture.

Finally, having conducted the review of the sentence mandated by § 9711(h)(3), aided by the sentencing data compiled and monitored by the Administrative Office of the Pennsylvania Courts, we conclude that the sentence of death imposed upon Karenbauer is not excessive or disproportionate to the penalty imposed in similar cases. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and sentence of death imposed upon Karenbauer by the Court of Common Pleas of Lawrence County.[8]

date of Act 28. *Commonwealth v. Gribble,* 550 Pa. 62, 89–91, 703 A.2d 426, 440 (1997).

**8.** Pursuant to 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to transmit, within ninety (90) days of the date the sentence of death is upheld by this Court, the complete record of this case to the Governor of Pennsylvania.