J-S62009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA N. CAMBRIC | : | |
| | : | |
| Appellant | : | No. 1601 WDA 2018 |

Appeal from the Judgment of Sentence Entered July 17, 2018
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0001269-2014

BEFORE: PANELLA, P.J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.: **FILED FEBRUARY 11, 2020**

Joshua N. Cambric appeals from the judgment of sentence entered in the Cambria County Court of Common Pleas on July 17, 2018 following his conviction for first degree murder and related charges for his involvement in a 2014 fatal shooting.

On March 30, 2014, Tony Phillips was shot and killed in the parking lot of a bar in Johnstown, Cambria County, while sitting in the driver's seat of his sister's car. At trial, the Commonwealth presented circumstantial evidence to establish that Cambric, Keith Reed, and Jeremy Woodard had formulated and carried out a plan to kill Tony Phillips. This evidence consisted of multiple witnesses and video surveillance footage from multiple locations.

Phillips' sister, Tanya Phillips, testified that Reed called her residence looking for her brother on the day of the murder. She told Reed that her

brother was not home, but offered suggestions on where he might be. Tanya had loaned her brother her golden tan colored Chevrolet Malibu earlier that day. Phillips' aunt testified that Reed came to her sister's house looking for Phillips and convinced Phillips to go have a drink with him.

The owner of the bar where the shooting occurred testified that while he was getting in his car to leave the bar that night he saw a gold-colored vehicle pull into the parking lot. He observed a black male, who he identified as Reed[1] get out of the passenger side of the gold car and go into the bar. He then saw a different black male, wearing glasses and gray cargo pants, come out and fire two shots from a handgun through the driver's door window of the gold car. The shooter then walked to a black SUV that was waiting for him. The owner identified Cambric as the shooter in court.

After local dispatch advised police to be on the lookout for a black SUV in connection with the shooting, they effectuated a stop of a vehicle matching the description in the parking lot of a gas station. A passenger alighted from the SUV before the driver attempted to flee by driving away. The driver, identified as Woodard, was apprehended shortly thereafter. The passenger was tracked to a local motel, were he was found in a room, having checked in approximately fifteen minutes before police arrived. An officer positively identified Cambric as the passenger who fled from the black SUV.

---

[1] He further testified that Reed was a regular patron of the bar.

Video evidence from the gas station showed Cambric exiting the black SUV and leaning down between the pumps, the black SUV departing, the police cruiser in pursuit, and Cambric walking toward the motel. Officers later located a firearm lodged between the gas pumps where Cambric had leaned down. Scientific testing and analysis established that all bullets recovered had been fired by the firearm recovered at the gas station.

The Commonwealth sought to try the men jointly. However, the trial court denied the Commonwealth's request. This Court quashed the Commonwealth's appeal of the denial, and our Supreme Court denied review. After several scheduling issues, trial was scheduled for March 2017.

Cambric filed a motion to dismiss the charges, asserting that his right to a speedy trial had been violated. After a hearing, the trial court denied the motion. Cambric then filed a motion seeking the recusal of the Cambria County District Attorney's office, which the trial court granted. The Office of the Attorney General assumed the responsibility for the case, and after trial, the jury convicted Cambric of first degree murder, conspiracy to commit murder, two counts of aggravated assault, receiving stolen property, and tampering with physical evidence.

On July 17, 2018, Cambric was sentenced to life imprisonment for first degree murder, a consecutive five to ten years' incarceration for receiving stolen property, and a consecutive six months to two years' incarceration for

tampering with or fabricating physical evidence.[2] The trial court subsequently amended the sentence on the charge of receiving stolen property to thirty-three to one-hundred and twenty months' incarceration.

Cambric filed timely post-sentence motions, which were denied after a hearing. This timely appeal followed.

In his first issue on appeal, Cambric challenges the sufficiency of the evidence to sustain all charges. Specifically, in his Rule 1925(b) statement, he contends the evidence was wholly inconsistent and speculative because the convictions were based solely on circumstantial evidence and the eyewitness' testimony was conflicting as to their identification of the perpetrator. Cambric is not challenging the sufficiency of the evidence to support any of the specific legal definitions of his convictions. Rather, he is challenging the sufficiency of the evidence to establish that he was the person who committed the crimes.

Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. **See Commonwealth v. Dale**, 836 A.2d 150, 152 (Pa. Super. 2003). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means

_____

[2] The charges of conspiracy to commit criminal homicide and aggravated assault merged with the charge of first degree murder for sentencing.

of wholly circumstantial evidence." ***Commonwealth v. Bruce***, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

"The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." ***Id***. (citation omitted). "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." ***Commonwealth v. Kinney***, 863 A.2d 581, 584 (Pa. Super. 2004) (citation omitted). Thus, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Bruce***, 916 A.2d at 661 (citation omitted).

The trial court, in its opinion, has thoroughly reviewed this claim and disposed of the argument on the merits. We have reviewed the parties' briefs, the relevant law, the certified record, and the trial court's well-written opinion. The trial court's findings of fact and conclusions of law comprehensively dispose of Cambric's first issue on appeal, with appropriate references to the record and without legal error. We therefore adopt its reasoning and affirm on its basis. ***See*** Trial Court Opinion, 2/5/2019. It is clear there is overwhelming evidence in support of the verdict.

Furthermore, although Cambric phrased this claim as a challenge to the sufficiency of the evidence, we find his claim to be more properly categorized as a challenge to the weight of the evidence. Cambric's argument focuses almost exclusively on his contention that the testimony was contradictory and

inconsistent. This is a challenge not to the *sufficiency* of the evidence, but to its *weight*.[3] **See Commonwealth v. Wilson**, 825 A.2d 710, 713-714 (Pa. Super. 2003) ("A sufficiency of the evidence review, however, does not include an assessment of the credibility of the testimony offered by the Commonwealth.") As Cambric has raised a separate weight claim in his second issue on appeal, we will address the issue on its merits.

In his challenge to the weight of the evidence supporting the jury's verdict, Cambric raises the same arguments he made in his sufficiency argument, specifically that the eyewitness testimony was conflicting. Cambric contends the jury's verdict based on solely circumstantial evidence was so contrary to the evidence that it constitutes a miscarriage of justice and requires the grant of a new trial.

We do not review challenges to the weight of the evidence *de novo* on appeal. **See Commonwealth v. Rivera**, 983 A.2d 1211, 1225 (Pa. 2009). Rather, we only review the trial court's exercise of its discretionary judgment regarding the weight of the evidence presented at trial. **See id**. We may only reverse the lower court's verdict if it is so contrary to the evidence as to shock

_____

[3] While challenges based on inconsistent testimony generally implicate the weight of the evidence, our Supreme Court has made an exception to the general rule that the finder of fact is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture. **Commonwealth v. Karkaria**, 625 A.2d 1167, 1170 (Pa. 1993). Instantly, we do not find that the verdict was based on conjecture or that the testimony was so inherently unreliable as to render the verdict unsupportable.

one's sense of justice." **Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003) (citations omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." **Commonwealth v. Davidson**, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted).

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review.

**Commonwealth v. Gibbs**, 981 A.2d 274, 282 (Pa. Super. 2009) (citations omitted).

Cambric mainly takes issue with the eyewitness's testimony regarding the color of the perpetrator's pants. **See** Appellant's Brief, at 28-29. We have to agree with the trial court that Cambric's challenge is simply a "mere conflict in testimony" and does not constitute grounds for a new trial. Further, we agree with the trial court that the evidence in this case was voluminous, including not only the eyewitness testimony, but additionally video evidence documenting nearly every aspect of Cambric's actions throughout the day. The video evidence alone, if believed by the fact finder, was enough to convict Cambric. Accordingly, we find Cambric's weight claim is without merit.

Next, Cambric contends the trial court abused its discretion by denying his oral motion to recuse defense counsel for a conflict of interest.

> A defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice. [T]his Court [has held] that while it is true that prejudice is presumed when counsel is burdened by an actual conflict of interest, this is only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.

***Commonwealth v. Spotz***, 896 A.2d 1191, 1231-32 (citations and internal quotation marks omitted).

Cambric takes issue with the fact that defense counsel had previously prepared estate planning documents for a testifying detective from the Johnstown police department. Counsel also probated the detective's parents' estates. Finally, counsel had an informal discussion with the detective regarding a civil suit shortly before trial, but testified that no attorney client relationship had been created by this conversation.

Here, Cambric has failed to demonstrate that counsel "actively represented conflicting interests." ***Id.*** Under these circumstances, we conclude that this is not a case of concurrent representation because, as alleged by Cambric, his concern regards trial counsel's *previous* representation of a Commonwealth witness in cases that were unrelated to the instant matter, and that had been concluded prior to Cambric's trial. Because this case involves successive and not dual representation, Cambric must demonstrate he was prejudiced by any potential conflict of interest. ***See***

*Commonwealth v. Cousar*, 154 A.3d 287, 310 (Pa. 2014); *see also Commonwealth v. Karenbauer*, 715 A.2d 1086, 1094 (Pa. 1998) (holding that "[a] defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice").

Cambric has failed to demonstrate the requisite prejudice as he provides no nexus between trial counsel's previous representation of the Commonwealth witness and counsel's performance at Cambric's trial. His concerns seem to be merely speculative. Additionally, the trial court took precautionary measures to protect Cambric's due process rights, specifically engaging in a colloquy with Cambric to ensure a full and fair opportunity to cross-examine the witness. Cambric was given the opportunity to ensure trial counsel asked all questions Cambric wanted posed to the witness and that trial counsel did not ask any questions Cambric did not want posed. Cambric offers no evidence that trial counsel restricted his cross-examination of the Commonwealth witness because he was laboring under a conflict of interest. Rather, Cambric specifically testified that he was satisfied with trial counsel's cross-examination.

The trial court made the decision to deny Cambric's motion to remove trial counsel based on an alleged conflict of interest after hearing testimony and argument from both sides. The trial court's conclusion that Cambric failed to demonstrate a conflict of interest is sound. Accordingly, we find Cambric is not entitled to relief. *See Commonwealth v. Spotz*, 896 A.2d 1191, 1232

(Pa. 2006) (rejecting claim based on counsel's representation of a client which had terminated prior to his appointment to represent the defendant because the defendant offered nothing more than bald assertions, with no evidence to suggest that counsel's conduct was due to the alleged conflict of interest).

Next, Cambric contends the trial court abused its discretion by denying his motions for dismissal of charges on Pa.R.Crim.P. 600 speedy trial grounds.

Our scope and standard of review on this issue are as follows.

> Our standard of review relating to the application of Rule 600 is whether the trial court abused its discretion. Our scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing and the findings of the trial court. We must view the facts in the light most favorable to the prevailing party.

*Commonwealth v. Robbins*, 900 A.2d 413, 415 (Pa. Super. 2006) (citation omitted).

> Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600].  Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

*Commonwealth v. Hunt*, 858 A.2d 1234, 1239 (Pa. Super. 2004) (*en banc*) (citation omitted; brackets in original).

> Rule 600 "provides for dismissal of charges only in cases in which the defendant has not been brought to trial within the term of the adjusted run date, after subtracting all excludable and excusable time." The adjusted run date is calculated by adding to the

mechanical run date, *i.e.*, the date 365 days from the complaint, both excludable time and excusable delay. "Excludable time" is classified as periods of delay caused by the defendant. "Excusable delay" occurs where the delay is caused by circumstances beyond the Commonwealth's control and despite its due diligence. "Due diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth." Due diligence includes, *inter alia*, listing a case for trial prior to the run date, preparedness for trial within the run date, and keeping adequate records to ensure compliance with Rule 600. Periods of delay caused by the Commonwealth's failure to exercise due diligence must be included in the computation of time within which trial must commence.

*Commonwealth v. Moore*, 214 A.3d 244, 248-249 (Pa. Super. 2019) (citations omitted).

"Once a violation of Rule 600 has been established ... the inquiry becomes whether the Commonwealth exercised due diligence in bringing [a defendant] to trial and if the circumstances occasioning the postponement were beyond the control of the Commonwealth." *Commonwealth v. Kearse*, 890 A.2d 388, 392 (Pa. Super. 2005). "The Commonwealth ... has the burden of demonstrating by a preponderance of the evidence that it exercised due diligence." *Commonwealth v. Cole*, 167 A.3d 49, 71 (Pa. Super. 2017) (citation and quotation marks omitted).

In its opinion, the trial court fully stood by its order dated February 1, 2017, and its opinion dated March 9, 2017. *See* Trial Court Opinion, 2/12/2019, at 3. In that prior opinion, the trial court thoroughly and thoughtfully summarized and addressed Cambric's claims concerning his Rule

600 challenges, set forth the relevant law, and determined that, while it is regrettable that the whole process took so long, the Commonwealth had nevertheless exercised due diligence in bringing Cambric's case to trial. ***See*** Trial Court Opinion, 3/9/2017. We affirm based on the trial court's sound, and comprehensive, rationale with regard to this issue. ***See id.***

In his last issue on appeal, Cambric simply makes a blanket argument that the trial court erred in denying his post sentence motions for the reasons raised in the prior four issues. As we have already addressed each issue separately, we need not address them again.

As we find none of Cambric's issues on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/11/2020

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY
CRIMINAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : NO. 1269 – 2014 |
| | : |
| | : |
| vs. | : |
| | : |
| JOSHUA CAMBRIC, | : |
| Defendant. | : |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

For the Commonwealth:  GREGORY SIMATIC, ESQUIRE
Deputy Attorney General

For the Defendant:  CHRISTY P. FOREMAN, ESQUIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**OPINION IN SUPPORT OF ORDER PURSUANT TO
PENNSYLVANIA RULE OF APPELLATE PROCEDURE 1925(a)**

FLEMING, J., February 5, 2019.    Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the trial court submits the following Opinion in support of its judgment of sentence entered on July 17, 2018:

**PROCEDURAL HISTORY**

On June 13, 2018, a jury convicted Defendant Joshua Cambric of First Degree Murder, Criminal Conspiracy to Commit Criminal Homicide, Aggravated Assault (two counts), Receiving Stolen Property, and Tampering with or Fabricating Physical Evidence in the 2014 shooting death of Tony Phillips at Edder's Den, a bar in Johnstown, Cambria County.  N.T. (JUN. 13, 2018), pp. 108-109.  On July 17, 2018, the trial court sentenced Defendant to life imprisonment on the charge of First Degree Murder, a consecutive sentence of five to ten years' incarceration for Receiving Stolen Property, and a consecutive sentence of six months to

two years' incarceration for Tampering with or Fabricating Physical Evidence.[1] N.T. (JUL. 17, 2018), pp. 16-17. By Order dated July 19, 2018, the trial court amended Defendant's sentence on the charge of Receiving Stolen Property to 33 months' to 120 months' incarceration, consecutive to the sentence imposed on the charge of First Degree Murder. AMENDED SENTENCING ORDER DATED JULY 19, 2018.

On July 26, 2018, Defendant filed timely Post-Sentence Motions. DEFENDANT'S POST-SENTENCE MOTIONS FILED JULY 26, 2018. The trial court entertained oral argument on the Post-Sentence Motions on August 31, 2018. *See* SCHEDULING ORDER DATED JULY 30, 2018. On October 9, 2018, the trial court denied Defendant's Post-Sentence Motions. ORDER DATED OCT. 9, 2018.

On October 30, 2018, Defendant filed a Notice of Appeal. NOTICE OF APPEAL FILED OCT. 30, 2018. On November 28, 2018, Defendant filed a Concise Statement of Errors Complained of on Appeal ["Concise Statement"]. CONCISE STATEMENT FILED NOV. 28, 2018.

## ISSUES RAISED ON APPEAL

In his Concise Statement, Defendant raises the following issues on appeal:

I.  The evidence in this matter was insufficient to sustain [Defendant]'s convictions for First Degree Murder, Criminal Conspiracy, Aggravated Assault, Receiving Stolen [P]roperty, and Tampering with/Fabricating Physical Evidence as the evidence was so weak and inconclusive that, as a matter of law, no probability of fact could be drawn from the combined circumstances. Even viewed in a light most favorable to the verdict winner, the wholly inconsistent and speculative evidence presented at trial does not support the jury's verdict beyond a reasonable doubt.

II. The verdict in this case was against the weight of the evidence as the jury's verdict was so contrary to the inconsistent and speculative evidence presented at trial that it would shock one's sense of justice, thus requiring a new trial.

---

[1] The charges of Criminal Conspiracy to Commit Criminal Homicide and Aggravated Assault (two counts) merged with the charge of First Degree Murder.

2

III.    The Trial Court abused its discretion in denying [Defendant]'s oral motion to recuse defense counsel, Gary Vitko, Esquire, for a conflict of interest.

IV.    The Trial Court abused its discretion in denying [Defendant]'s motions for dismissal of charges pursuant to Pa.R.Crim.P. 600 and dismissal of the Information for a violation of his right to a speedy trial.

V.    The Trial Court erred in denying [Defendant]'s Post-Sentence Motions.

CONCISE STATEMENT, ¶¶ I-V. The trial court will address the Rule 600 issue first because it occurred first in time.

## LEGAL ANALYSIS

### I.    The trial court did not err in denying Defendant's Rule 600 Motion.

(On January 7, 2019, a panel of the Superior Court[2] affirmed the trial court on a nearly identical Rule 600 motion filed by a co-defendant. *See Commonwealth v. Reed*, No 641 WDA 2018 (UNPUBLISHED MEMORANDUM FILED JAN. 7, 2019).)

On January 5, 2017, Defendant filed a "Motion for Dismissal of Charges Pursuant to Pennsylvania Rule of Criminal Procedure 600"; on January 11, 2017, Defendant filed a "Motion for Dismissal of Information for Violation of Right to Speedy Trial" [collectively "Rule 600 Motions"]. The trial court conducted a hearing on January 24, 2017, and denied Defendant's Rule 600 Motions by Order dated February 1, 2017. On March 9, 2017, the trial court filed an Opinion supplementing the decision rendered on February 1, 2017.

Defendant did not renew his Rule 600 Motions at any other time prior to trial. Therefore, the trial court stands by its Order dated February 1, 2017, and its Opinion dated March 9, 2017, which are attached to this Opinion as Appendix A and Appendix B, respectively.

---

[2] Shogun, J., Dubow, J., and Stephens, P.J.E. (Former Justice specially assigned to the Superior Court).

3

II. **Defendant's convictions for First Degree Murder, Criminal Conspiracy, Aggravated Assault, Receiving Stolen Property, and Tampering with/Fabricating Physical Evidence were not against the weight and sufficiency of the evidence presented at trial by the Commonwealth.**

Defendant argues that his convictions for First Degree Murder, Criminal Conspiracy to Commit Criminal Homicide, Aggravated Assault (two counts), Receiving Stolen Property, and Tampering with or Fabricating Physical Evidence were against the weight and sufficiency of the evidence presented by the Commonwealth at trial. CONCISE STATEMENT, ¶¶ I AND II. As stated in *Commonwealth v. Whiteman.* "[s]ufficiency of the evidence and weight of the evidence are discrete inquiries...." *Com. v. Whiteman.* 485 A.2d 459, 461 (Pa. Super. 1984) (citations omitted). Therefore, the trial court will analyze them separately.

### Sufficiency of the Evidence

Pursuant to Pennsylvania Rule of Criminal Procedure 606, a defendant may challenge the sufficiency of the evidence in various ways, including a motion for judgment of acquittal at the close of the Commonwealth's case-in-chief or a challenge to the sufficiency of the evidence on appeal. PA.R.CRIM.P. 606(A)(1)(7).

Defendant first raised this issue in a motion to dismiss at the close of the Commonwealth's case-in-chief. N.T. (JUN. 13, 2018). pp. 40-43. Specifically, Defendant argued that the Commonwealth failed to identify Defendant as the alleged shooter. *Id.* at p. 40.

In Pennsylvania, the standard of review for a challenge to the sufficiency of the evidence is as follows:

> As a general matter. our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused. beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and

4

inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Com. v. Lynch*, 72 A.3d 706, 707-08 (Pa. Super. 2013) (citations and quotations omitted).

With respect to first degree murder, the Pennsylvania Supreme Court explained:

In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. An intentional killing is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body.

*Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008) (citations and quotations omitted).

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." *Com. v. Rios, supra*, at 1030 (citations omitted); *see also* 18 Pa.C.S. § 903(a)(e).

For aggravated assault, the Commonwealth must show that the defendant "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; . . . or (4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." *Com. v. Alexander*, 383 A.2d 887, 888–889 (Pa. 1978); *see also* 18 Pa.C.S. § 2702(a).

"To sustain a conviction for receiving stolen property, the Commonwealth must prove beyond a reasonable doubt that: 1) the property was stolen; 2) the accused knew or had reason to believe the property was stolen; and 3) the accused received, retained or disposed of the property." *Com. v. Brady*, 560 A.2d 802, 808 (Pa. Super. 1989); *see also* 18 Pa.C.S.A. § 3925.

5

For tampering with/fabricating physical evidence, the Commonwealth must prove "(1) the defendant knew that an official proceeding or investigation was pending; (2) the defendant altered, destroyed, concealed, or removed an item; and (3) the defendant did so with the intent to impair the verity or availability of the item to the proceeding or investigation." *Commonwealth v. Morales*, 669 A.2d 1003, 1005 (Pa. Super. 1996); *see also* 18 Pa.C.S.A. § 4910(1).

In the case at bar, the Commonwealth presented sufficient circumstantial evidence to prove each element of First Degree Murder, Criminal Conspiracy to Commit Criminal Homicide, Aggravated Assault (two counts), Receiving Stolen Property, and Tampering with or Fabricating Physical Evidence beyond a reasonable doubt. With respect to First Degree Murder, the circumstantial evidence was sufficient to establish that (1) Tony Phillips was unlawfully killed; (2) Defendant is responsible for the killing; and (3) Defendant acted with specific intent to kill. For Criminal Conspiracy, the circumstantial evidence was sufficient to establish that (1) Defendant entered into an agreement with Keith Reed and Jeremy Woodard to murder Tony Phillips; (2) Defendant had a shared criminal intent with Reed and Woodard; and (3) Defendant shot Phillips in furtherance of the conspiracy. With respect to Aggravated Assault, the circumstantial evidence was sufficient to establish that Defendant intentionally caused serious bodily injury to Phillips with a deadly weapon. For Receiving Stolen Property, the circumstantial evidence was sufficient to establish that (1) the firearm was stolen; (2) Defendant knew or had reason to believe the firearm was stolen; and (3) Defendant retained or disposed of the stolen firearm. With respect to Tampering with or Fabricating Physical Evidence, the circumstantial evidence was sufficient to establish that (1) Defendant knew an official proceeding or investigation was pending; (2) Defendant concealed the firearm used to kill Phillips; and (3) Defendant did so with the intent to impair the verity or availability of the item to the proceeding or investigation.

The Commonwealth's evidence included multiple witnesses and video surveillance from March 30, 2014. The surveillance footage captures the actions of Woodard, Reed, and Defendant prior to and after the shooting. The footage also corroborates the witness testimony.

6

Witness Steve Shumaker testified that he reported his black semi-automatic nine millimeter pistol, serial number P1594761, stolen on November 11, 2013. N.T. (JUN. 12, 2018, MORNING SESSION), pp. 22-23. He also testified that he did not give Defendant permission to have the firearm or be in possession of the firearm. *Id.* at p. 23.

Detective Brett Hinterliter of the Johnstown Police Department described collecting relevant video surveillance from the Fairfield Avenue Lounge (a bar) and the Johnstown Housing Authority. N.T. (JUN. 12, 2018, AFTERNOON SESSION). pp. 55-68. Exterior video surveillance from the Fairfield Avenue Lounge shows the three men (Woodard. Reed, and Defendant) arriving at the bar together in a black sport-utility vehicle (SUV) driven by Woodard. *Id.* at pp. 59-60; COMM. EXHIBIT 48. The interior video surveillance shows the three men in the bar area for a short period of time. N.T. (JUN. 12, 2018, AFTERNOON SESSION). p. 60; COMM. EXHIBIT 48. Before leaving, Reed buys a six-pack and a 40-ounce bottle of beer. N.T. (JUN. 12, 2018, AFTERNOON SESSION), p. 61; COMM. EXHIBIT 48. The exterior video surveillance then shows the three men leaving in the same black SUV at 6:53 P.M. N.T. (JUN. 12, 2018 AFTERNOON SESSION). pp. 61-62; COMM. EXHIBIT 48.

The victim's sister, Tanya Phillips ["Tanya"]. testified that she and her brother. Tony Phillips ["Tony"], spent part of March 30, 2014, together at her mother's house. N.T. (JUN. 12, 2018. MORNING SESSION), p. 33. Tanya loaned Tony her golden-tan-colored Chevrolet Malibu to pick up their mother, who was nearby at their aunt's house. *Id.* at pp. 34-35. While Tony was gone, Reed called Tanya, looking for her brother. *Id.* at p. 36. Tanya had known Reed for years because his grandparents were her foster parents when she was 11 years old. *Id.* Tanya reported that Reed had never called her before. so she thought it was "weird." *Id.* at p. 37. Tanya told Reed that Tony "might be at my mother's or he might be down the street." *Id.* at pp. 36-37. At the time, Tony was living with his mother. *Id.* at p. 33.

Tony Phillips's maternal aunt, Lessie Perry, testified that she was with Tony on the afternoon and evening of March 30, 2014. *Id.* at p. 44. Perry was at her sister's house with Tony and Tony's mother (her sister) when Reed came to the house. looking for Tony. *Id.* at pp.

7

44-45. Perry explained she had known Reed for a long time. *Id.* at p. 43. Perry testified that Reed urged Tony to go out drinking with him. *Id.* at p. 44. Eventually, Tony left with Reed. *Id.* at p. 47.

The Commonwealth presented three witnesses from Edder's Den, including two eyewitnesses to the shooting. Edward Gawel, the owner of Edder's Den, explained that he and his girlfriend, Ruth Hastie, were at the bar on March 30, 2014. N.T. (JUN. 11, 2018), pp. 85-86. At approximately 7:00 P.M, Gawel and Hastie left the bar and walked to Hastie's car in the parking lot. *Id.* at pp. 76-78. From the front passenger seat, Gawel noticed a gold vehicle pull into the spot next to him, close to Hastie's vehicle. *Id.* at pp. 88-91. Gawel testified he could not see the individuals initially because the car windows were tinted. *Id.* at pp. 90-91. Gawel observed a black male exit the passenger side of the gold vehicle and walk behind Hastie's car into the bar. *Id.* at p. 91. Gawel identified the black male as Reed, who was a patron of Edder's Den. *Id.*

Gawel testified that, as Hastie was backing up her car, a different black male with glasses and gray cargo pants walked in front of their vehicle with a handgun in his right hand along his side. *Id.* at pp. 92-93. The black male shot out the window and took a second shot into the vehicle through the shattered window. *Id.* at p. 93. The black male then walked away from the gold car to a black SUV that was waiting for him on the street beside Edder's Den. *Id.* at 94. Gawel testified that the shooter had short hair with no facial hair; Gawel identified Defendant as the shooter in court. *Id.* at pp. 109-110.

Hastie confirmed Gawel's version of events. *Id.* at pp. 114-136. Likewise, Hastie was able to identify Reed as the black male who exited the gold vehicle. *Id.* at pp. 121-122. Hastie was familiar with Reed as a patron of the bar. *Id.* at p. 122. Immediately after the shooting, Hastie drove her car across the street beside Edder's Den. *Id.* at p. 126. When they were across the street, Hastie stopped her vehicle at Gawel's request. *Id.* Gawel ran over to the gold car and Hastie went into the bar. *Id.* at p. 127. Hastie saw Reed leaning against a pool table in the front of the bar. *Id.* at p. 128. Hastie testified that Reed did not have a drink in his hand,

8

and he did not purchase anything at the bar. *Id.* When word reached the bar patrons that there had been a shooting in the parking lot, Hastie watched Reed walk in front of her and leave the bar. *Id.* at p. 129. Hastie lost sight of Reed after that. *Id.*

A third bar patron, Debra Mickens, testified that she has known Reed for at least 20 years. *Id.* at p. 139. She recalled seeing Reed at Edder's Den on March 30, 2014. *Id.* at p. 140. When he arrived that day, Reed had a brief conversation with Mickens, who was seated at the bar two or three seats away from the front door. *Id.* Reed and Mickens went outside "for a minute, maybe two minutes" before she walked back into the bar. *Id.* Mickens watched Gawel and Hastie leave through the back of the bar. *Id.* From the window, Mickens watched Hastie and Gawell pull across the street and then run back. *Id.* Gawel was "heading towards the parking lot." *Id.* Gawel said, "[S]omebody got shot in the parking lot, call 911. Somebody just got shot in the parking lot." *Id.*

The Commonwealth offered additional video surveillance from Johnstown Housing Authority and Edder's Den showing Edder's Den, the parking lot, and the surrounding area. N.T. (JUN. 12, 2018, MORNING SESSION). pp. 113-115; COM. EXHIBIT 33; N.T. (JUN. 12, 2018, MORNING SESSION), pp. 132-140; COM. EXHIBIT 34. The footage corroborates the witnesses' testimony. Although the videos do not capture the shooting, they depict the events immediately before and immediately after it: Tony Phillips and Reed pulling into the parking lot at Edder's Den in Tanya Phillips's car, Reed entering Edder's Den, Defendant walking toward the parking lot of Edder's Den, Hastie's vehicle pulling out. Defendant running and re-entering the black SUV, Gawell running toward Edder's Den, and Reed calmly exiting the bar and walking away. N.T. (JUN. 12, 2018. MORNING SESSION). pp. 113-115, 132-140.

The Commonwealth presented the testimony of then-Sergeant Joseph Eckenrod, a former shift supervisor with the Johnstown Police Department. *Id.* at pp. 51-52. On March 30, 2014, Eckenrod responded to a call regarding a gunshot victim in a vehicle outside Edder's Den. *Id.* at p. 52. After Eckenrod arrived at the scene and assessed the situation, he returned to his police cruiser and headed toward the station in Johnstown to notify the chain of command

9

and to call for more manpower. *Id.* at pp. 55-56. While he was driving. Eckenrod received a call from Cambria County dispatch that the suspect vehicle was an all-black SUV with a black male inside. *Id.* at p. 56. Shortly thereafter, Eckenrod observed a black SUV across the river driving inbound to Johnstown. *Id.*

Eckenrod followed the vehicle, verified that the driver was black, called for backup. and followed the car into the parking lot of Sheetz on Haynes Street in Johnstown. *Id.* at pp. 57-59. Eckenrod activated his lights to initiate a traffic stop. *Id.* at p. 59. A black male exited the passenger side of the vehicle wearing a gray shirt. wire-rim glasses, and jeans. *Id.* Eckenrod asked the black male, "'[W]hat's going on?" when the driver "ended up taking off at that point and leaving the area." *Id.* at p. 60. Eckenrod gave chase, eventually apprehending the black SUV in the parking lot of a McDonald's restaurant across Haynes Street. *Id.* Eckenrod ultimately identified the driver of the SUV as Jeremy Woodard. *Id.* Following the apprehension of Woodard, Officer Brad Christ informed Eckenrod that a black male fitting the description of the passenger ran across the street towards an Econo Lodge. *Id.* at pp. 61, 85. Eckenrod sent Christ and other officers to the Econo Lodge to identify the passenger. *Id.* Eckenrod stayed with Woodard and the SUV until both were secured. *Id.* In court, Eckenrode identified Defendant as the passenger from the vehicle at Sheetz. *Id.* at p. 63.

Officer Christ testified that the desk clerk at the Econo Lodge told him a black male with a gray shirt and glasses had checked into room 201. *Id.* at p. 85. Christ knocked on the door of room 201, and Defendant answered the door. *Id.* at pp. 85-86. Christ observed a gray shirt and glasses on the bed in plain view and a strong odor of hand soap. *Id.* at p. 86. Christ also observed that Defendant seemed "[v]ery nervous, appeared to be sweating." *Id.* Eckenrod arrived a short time later and identified the man as the passenger of the black SUV from Sheetz. *Id.* at 87. After Eckenrod identified Defendant. he was taken to the police station. *Id.* at p. 64.

Dash cam video from Eckenrod's police cruiser corroborated his testimony. *Id.* at pp. 65-68; COM. EXHIBIT 27 (CD OF DASH CAM FOOTAGE). Dash cam video from Christ's police cruiser also corroborated his testimony. *Id.* at pp. 88-91; COM. EXHIBIT 28 (CD OF DASH CAM

FOOTAGE).  Police found the six-pack of beer purchased by Reed at the Fairfield Avenue Lounge in the SUV. N.T. (JUN. 12, 2018, AFTERNOON SESSION), pp. 8-9; EXHIBITS 42 AND 43.

Eckenrod assigned Officer William Newman to look for weapons, drugs, or other evidence at the Sheetz where the SUV had stopped. N.T. (JUN. 12, 2018, MORNING SESSION), pp. 64, 98.  As Newman was looking in the convenience store's garbage cans, a Sheetz employee alerted Newman to relevant security footage. *Id.* at p. 99.  After watching numerous videos from Sheetz, Newman located a firearm near gas pumps five and six, lodged between one of the pumps and some signage. *Id.* at pp. 108-110; COM. EXHIBITS 30, 31, AND 32.  The recovered firearm's serial number was 1594761. N.T. (JUN. 12, 2018 AFTERNOON SESSION), p. 52; EXHIBIT 47.  Video surveillance footage from Sheetz on March 30, 2014, shows the black SUV pulling up near gas pumps five and six; Eckenrod's cruiser pulling behind it with lights activated; Defendant exiting the passenger side of the vehicle and leaning down in between the pumps; the black SUV leaving Sheetz; Eckenrod's cruiser in pursuit; and the passenger walking toward the Econo Lodge after being left at Sheetz. N.T. (JUN. 12, 2018, MORNING SESSION), pp. 100-108; COM. EXHIBIT 29.

Ashley McLaughlin testified that she was working at the front desk of the Econo Lodge on the evening of March 30, 2014. N.T. (JUN. 12, 2018, MORNING SESSION). p. 24.  The Econo Lodge is across the street from the Sheetz where Eckenrod stopped the black SUV. *Id.* at p. 27.  McLaughlin checked Defendant into the motel that evening around 7:45 P.M., and she noted that "he seemed real nervous." *Id.* at pp. 24-25.  McLaughlin remembered police arriving at the motel about 15 minutes after Defendant checked in. *Id.* at p. 27.  McLaughlin verified that Defendant checked into room 201 that evening. *Id.* at pp. 27-28; COM. EXHIBIT 26.

Cambria County Coroner Jeffrey Lees concluded that a gunshot wound to the chest caused Tony Phillips' death. N.T. (JUN. 11, 2018), p. 42.  Dr. Curtis Goldblatt, a general pathologist at Conemaugh Memorial Medical Center. performed an autopsy of Tony Phillips and concluded that a gun shot caused Phillips to die of exsanguination. *Id.* at pp. 58-75.

11

Viewing the circumstantial evidence in the light most favorable to the Commonwealth (the verdict winner) and giving the Commonwealth the benefit of all reasonable inferences to be drawn from the evidence, the Commonwealth's evidence is sufficient to support the verdict. The evidence establishes each material element of First Degree Murder, Criminal Conspiracy to Commit Criminal Homicide, Aggravated Assault (two counts), Receiving Stolen Property, and Tampering with or Fabricating Physical Evidence beyond a reasonable doubt:

1. The evidence was sufficient for a jury to infer that Defendant unlawfully killed Tony Phillips and acted with specific intent to kill when he shot Phillips in the Edder's Den parking lot.
2. The evidence was sufficient for a jury to infer that Defendant. Woodard. and Reed shared the criminal intent to murder Tony Phillips. The evidence was sufficient for a jury to infer that Defendant entered into an agreement with Reed and Woodard, namely, that Reed would lure Tony Phillips to Edder's Den, Defendant would shoot him. and Woodard would drive the getaway vehicle.
3. The evidence was sufficient for a jury to infer that Defendant shot the victim in furtherance of the conspiracy.
4. The evidence was sufficient for a jury to infer that the firearm used in the killing of Phillips was stolen; that Defendant had reason to believe the firearm was stolen; and that Defendant possessed and later concealed the firearm.
5. The evidence was sufficient for a jury to infer that Defendant concealed the firearm at Sheetz in an attempt to impair the criminal investigation that Defendant knew was pending.

Therefore. the Commonwealth's evidence was sufficient to sustain the verdict.


## Weight of the Evidence

Challenges to the weight of the evidence must first be presented to the trial court. *Commonwealth v. Brown*, 648 A.2d 1177, 1189–91 (Pa. 1994).

> A trial court will grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is *so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.*

12

*Id.* at 1189 (citations omitted). After the trial court grants or denies challenges to the weight of the evidence, the Superior Court is left to review the "exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence." *Id.* The appellate courts have repeatedly said they "will not reverse the grant [or denial] of a new trial, unless there was a clear abuse of discretion, or an error of law which controlled the outcome of the case. *Id.*

Here, the trial court did not abuse its discretion in denying Defendant's request for a new trial based on the weight of the evidence. The trial court correctly assessed the *voluminous* evidence as supportive of the verdicts. The Commonwealth presented video evidence and eyewitness testimony documenting nearly every aspect of Defendant's actions, as well as those of his co-defendants, throughout the day of the murder. *See "Sufficiency of the Evidence," supra.*

Defendant presents a general challenge to the weight of the evidence, claiming the verdict was "contrary to the inconsistent and speculative evidence presented at trial." CONCISE STATEMENT, ¶¶ II. During oral argument on Defendant's Post-Sentence Motions, appellate counsel pointed to an inconsistent description of Defendant's clothing on the day of the shooting,[3] an inconsistent location of a co-defendant at the time of the shooting,[4] and the popularity of black SUVs in the United States.[5] These challenges are examples of "mere conflict[s] in testimony" that are not grounds for a new trial. *Brown*, 648 A.2d at 1189.

In this case, the jury's verdict was not against the weight of the evidence. The trial court's denial of Defendant's request for a new trial was appropriate because the verdict did not shock one's sense of justice. And there is no abuse of discretion or error of law made by the trial court which controlled the outcome of the case.

---

[3] N.T. (AUG. 31, 2018), p. 4.
[4] *Id.* at p. 5.
[5] *Id.*

13

## III. The trial court did not abuse its discretion in denying Defendant's oral motion to recuse defense counsel, Gary Vitko, for an alleged conflict of interest.

On the morning of jury selection, Defendant made an oral motion to remove his then-defense attorney, Gary Vitko ["Trial Counsel"]. N.T. (JUN. 7, 2018), p. 16. Trial Counsel had disclosed that he formerly represented one of the Commonwealth's witnesses, Detective Lawrence Wagner ["Witness"], in an estate matter approximately eight to ten years before. *Id.* at pp. 6-7. Trial Counsel also admitted that Witness contacted him on April 24, 2018, for a consultation regarding a pending lawsuit against him. *Id.* at pp. 7-8, 11-12. Trial Counsel verified that he did not enter into an attorney/client relationship with Witness regarding the lawsuit. *Id.* at 12. Trial Counsel did not discuss Defendant's case with Witness. *Id.* at pp. 9-10, 13. At Defendant's trial, Witness testified primarily as an evidence custodian to establish the chain of custody for some of the Commonwealth's evidence. *Id.* at pp. 24-25; N.T. (JUN. 12, 2018, MORNING SESSION), pp. 121-147; N.T. (JUN. 12, 2018, AFTERNOON SESSION), pp. 4-28.

Following testimony and argument, the trial court denied Defendant's motion to remove Trial Counsel. N.T. (JUN. 7, 2018), pp. 31-34. During trial, the trial court took precautionary measures to protect Defendant's due process rights. For example, prior to jury selection, the trial court afforded Trial Counsel additional time to review potential stipulations to the chain of custody, which would have eliminated the need for the Commonwealth to call Witness during trial.[6] *Id.* at p. 33. At trial, the court engaged in the following colloquy with Defendant about the court's extra protective measures to ensure Defendant a full and fair opportunity to cross-examine Witness:

> THE COURT: I understand the Commonwealth has more evidence to present through [Witness].
>
> [TRIAL COUNSEL]: Okay, right.
>
> THE COURT: But when you are given the opportunity to cross examine him, at the end of that I'm going to excuse the jury on a break, regardless of what time it is. And then I'm going to colloquy [Defendant] to make sure there isn't any

---

[6] Defendant ultimately refused to stipulate to the chain of custody.

14

issue with anything that you have not asked [Witness] or, you know, any deficiency he notes, and we're going to correct it right here.

[TRIAL COUNSEL]: Understood.

THE COURT: So, [Defendant], I would encourage you to participate in the cross with your counsel by telling him, you know, what you want to make sure to address on cross examination because I'm going to ask you about that just to make sure that you believe the cross examination was fair. And anything you think we missed we're going to correct right here. Okay?

. . . .

THE DEFENDANT: Yes. I'm never going to be comfortable with the situation that—with what the situation is. Everybody here is aware of it. And there's nothing that's going to make me comfortable about it. I just want to wait. I don't have a choice.

THE COURT: Okay. Well, here's what I'm trying to do to make you comfortable with it. On Thursday when we had the lengthy discussion about your reservations, none of us knew—except for the Commonwealth's proffer, which is their indication of what [Witness] is going to talk about, we didn't have any indication about the specifics other than that he was mainly a custodian witness. In other words, he obtained the video from Edder's Den. He's gotten the bullet, et cetera. I think we're going to hear some other things as well.

After today, we're going to know exactly what his role as a witness is, and then you're going to be able to confer with your attorney about what you want to inquire about on cross examination.

So I understand that you say you're never going to feel comfortable, but today is going to be your opportunity to ask [Witness], through your counsel, anything you want. And so when he's finished, when [Trial Counsel] is finished with that cross examination, I'm going to bring you up here and I'm going to ask you if there's anything else that you wanted [Trial Counsel] to ask [Witness] that he didn't ask [Witness].

THE DEFENDANT: Right. That doesn't—that's not going to really change the order that was made previously. That's not going to really—.

THE COURT: Absolutely not. Obviously you don't have a new lawyer.

15

THE DEFENDANT: Right.

THE COURT: What I'm trying to do is find out from you what specifically your issue is. So if—you said before you don't think that, you know, [Trial Counsel] would fully cross examine him. That's going to be your opportunity. And then I'll bring the jury back in, and [Trial Counsel] will ask [Witness] anything that you believe should have been asked that wasn't.

THE DEFENDANT: To be perfectly clear--.

THE COURT: So I'm trying to take what is a theoretical issue in your mind and mike it concrete and resolve it if there's anything to be resolved.

THE DEFENDANT: Okay. To be perfectly honest, it's not only assure my mind [sic], but [Trial Counsel] actually admitted that during the Thursday— well, the meeting we had on Thursday. He said that subconsciously he would struggle with what he was talking about.

THE COURT: No. What he said was he could guarantee what he does consciously. He couldn't tell us what he would do subconsciously. He didn't say he would subconsciously favor [Witness] because of their prior relationship. He said he would—he couldn't—he didn't know what he would do, and I thought that was a very candid response to the question. All right?

THE DEFENDANT: Yeah.

THE COURT: So, again, I'm trying to take a theoretical problem, which I have resolved by denying your motion to substitute counsel at the last minute, and I'm trying to figure out—at the end of the cross, I want to make sure that you're aware you are going to have to get up there. I am going to colloquy you and ask you if there's any deficiency.

So if there's a deficiency, I want you to make sure that you're communicating with [Trial Counsel] throughout the cross examination. And then at the end, outside the hearing of the jury, I'm going to make sure that you're comfortable with the cross today. Okay?

So I wanted—I wanted to give you that advance notice so you were aware that I'm going to ask you, outside the hearing of the jury, if you perceive any deficiencies in the way that [Trial Counsel] cross examined [Witness].

THE DEFENDANT: Okay.

16

THE COURT: I'm trying to make sure this is as fair as possible. I know my ruling was not in your favor, so I'm going to do what I can to make sure that your due-process rights are protected. Okay?

THE DEFENDANT: Yes.

N.T. (JUN. 12, 2018, MORNING SESSION), pp. 148-152.

During the trial, Trial Counsel and Defendant conferred regarding Witness's cross-examination. N.T. (JUN. 12, 2018, AFTERNOON SESSION), pp. 29-30. The trial court then questioned Defendant to ensure that (1) Trial Counsel had asked or would ask all of the questions Defendant wanted to pose to Witness; and (2) Trial Counsel did *not* ask any questions that Defendant told Trial Counsel not to ask. *Id.* at pp. 29-38. Defendant actively participated in a discussion regarding possible areas of inquiry. *Id.* at pp. 30-33. Defendant testified that he was satisfied with Trial Counsel's cross-examination, saying "So far so good." *Id.* at pp. 33-34. Trial counsel then asked Witness about Defendant's additional areas of inquiry. *Id.* at pp. 39-40.

In *Commonwealth v. Weiss*, 81 A.3d 767 (Pa. 2013), a criminal defense attorney also represented a Commonwealth witness prior to a homicide trial. The Supreme Court ruled that defense counsel was not acting under an actual conflict at the time of defendant's trial:

> On the merits of the ineffectiveness issue, we expressed disagreement with the PCRA court's finding that counsel was conflicted due to simultaneous representation of Defendant and [Commonwealth witness]. Rather, this Court's review of the record revealed that the circumstances here involved successive, rather than simultaneous, representation. Specifically, the public defender's office began representing [Commonwealth witness] in an unrelated matter in August 1995[;] [Commonwealth witness] was sentenced January 15, 1996[;] and Defendant's trial began after [Commonwealth Witness]'s sentence was imposed.

*Weiss* at 780.

Successive representation alone does not eliminate the possibility of a conflict. In *Commonwealth v. Toro*, the defense counsel previously represented one of the co-actors. The Superior Court noted that there can be a conflict of interest even in cases of successive representation:

17

> While a conflict of interest may be more difficult to prove in the absence of simultaneous representation, the courts have recognized that a conflict of interest may arise if counsel reveals privileged communications of the former client or otherwise divides his loyalties so that he is incapable of diligently representing his client.

*Commonwealth v. Toro*, 638 A.2d 991, 997 (Pa. Super 1994) (citing *Commonwealth v. Munson*, 615 A.2d 343, 347-348 (Pa. Super 1992)).

In the case at bar, Trial Counsel engaged in successive, rather than simultaneous, representation of Witness and Defendant. Defendant's trial began long after Trial Counsel handled Witness's estate matters. Although Trial Counsel more recently answered questions from Witness about a pending lawsuit, the consultation did not rise to the level of an attorney-client relationship. In any event, there is no suggestion that Trial Counsel revealed privileged communications or otherwise divided his loyalties between Defendant and Witness; rather, he diligently represented Defendant throughout the course of the trial. Furthermore, the trial court conducted several colloquies with Defendant before, during, and after Witness's testimony to ensure that Defendant had a full and fair opportunity to cross examine him. Defendant failed to demonstrate any actual prejudice because of Trial Counsel's successive representation of Witness and Defendant.

## IV. The trial court did not err in denying Defendant's Post-Sentence Motions.

Defendant withdrew a claim in his Post-Sentence Motions that the trial court abused its discretion in denying Defendant's oral motion to retain a court-appointed toxicology expert. N.T. (Aug. 31, 2018), p. 8. All other issues are addressed above.

### CONCLUSION

For the reasons set forth above, the trial court's judgment of sentence should be AFFIRMED.

RESPECTFULLY SUBMITTED:

_Linda Rovder Fleming_

Linda Rovder Fleming, J.

18