J-A17014-24

2024 PA Super 259

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD P. NICOLETTI | : | No. 2228 EDA 2023 |

Appeal from the Order Entered August 14, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009325-2021

BEFORE: BOWES, J., NICHOLS, J., and SULLIVAN, J.

OPINION BY BOWES, J.:                          **FILED NOVEMBER 6, 2024**

The Commonwealth of Pennsylvania appeals from the order granting the request of Richard P. Nicoletti ("Appellee") to change the venue of his prosecution based upon pretrial publicity. Upon review, we affirm.

We provide the following background. On June 1, 2020, several thousand people gathered in Philadelphia to protest the police killing of George Floyd. Appellee was dispatched as a SWAT officer with the Philadelphia police to manage the protest. As the demonstrators marched on Interstate 676, officers began to release tear gas to clear the highway. Amid the dispersal, Diamonik Hough, Katherine Miller-Walsh, and Christina Sorensen sat down on the highway. Appellee sprayed each of the three demonstrators in the face, in turn, with oleoresin capsicum ("OC") spray, commonly known as pepper spray. He then ordered them to vacate the highway, which they did. Notably, video captured the spraying incident. The Commonwealth ultimately charged

Appellee with one count of possession of an instrument of crime and three counts each of simple assault, official oppression, and recklessly endangering another person.

Appellee proceeded to jury selection on May 1, 2023. At approximately 11:00 a.m. that day, the communications director for the District Attorney's Office released media guidance regarding the trial and included hyperlinks to two news articles as a way of "[d]ropping background for [the media's] convenience[.]"[1] Order, 8/14/23, at Exhibit A ("Media Guidance: SWAT officer trial"). The text of the release provided:

> Opening arguments could begin as early as today for **Commonwealth v. Richard Nicoletti**, a former Philadelphia SWAT officer who was arrested and charged for tear-gassing protesters on I-676 during the 2020 racial injustice uprisings. The D[istrict Attorney]'s Special Investigations Unit prosecution team is awaiting a courtroom assignment, so when we do get a judge and a jury, I will let you all know.

*Id*. Based upon this release, the trial court issued a gag order covering the Commonwealth, Appellee, and their attorneys. A jury was picked, the Commonwealth's case presented, and, after several unsuccessful days of deliberating, the jury was unable to reach a consensus. Therefore, the court declared a mistrial.

The Commonwealth filed multiple motions in anticipation of a retrial, and Appellee filed the operative motion requesting a change of venue. According to Appellee, coverage of the incident, specifically, and the Black

---

[1] One of the links was to a New York Times video investigation, which we discuss in depth in the body of this opinion.

Lives Matter protests, more generally, has "fueled an avalanche of inflammatory media attention which has severely prejudiced the opportunity for [Appellee] to select a fair and impartial jury in Philadelphia County." Motion for a Change of Venue and/or Venire, 8/1/23, at ¶ 9. The court held a hearing on the litany of pending motions and ruled on each from the bench. As to Appellee's venue motion, the court held as follows: "Based upon the [first jury] pool, the environment, the myriad articles, [and] the necessity of the gag order, the [c]ourt grants the change of venue motion." N.T. Hearing, 8/9/23, at 30.

The court subsequently entered a written order granting the motion to change venue. Although the order was dated August 9, 2023, the same day as the hearing, it was not docketed and served on the parties until August 14, 2023. Thereafter, the Commonwealth filed reconsideration motions and another motion *in limine*, before initiating the instant appeal on August 23, 2023. The Commonwealth complied with the trial court's request to file a Pa.R.A.P. 1925(b) statement. The trial court authored a Rule 1925(a) opinion, opining preliminarily that the Commonwealth's appeal was untimely filed from the court's pronouncement on August 9, 2023.

The Commonwealth presents the following issues for our consideration:

1. Did the trial court err by finding that the Commonwealth untimely filed its appeal?

2. Did the trial court err by granting [Appellee]'s motion to change venue where [Appellee] failed to prove, and the record did not show, that pretrial publicity caused [Appellee] to suffer actual

or presumed prejudice, preventing the empaneling of an impartial jury in Philadelphia County?

3. Did the trial court err by granting [Appellee]'s motion to change venue based on a finding of presumed prejudice, where the pretrial publicity was factual and objective, did not include any reenactments of the crime by [Appellee], did not derive from official police or prosecutorial reports, and did not saturate the community, and where there was sufficient time between any alleged prejudicial publicity and the trial for any prejudice to dissipate?

4. Did the trial court err by rendering judgment based on facts outside the record, which the court independently investigated and discovered?

Commonwealth's brief at 5.[2]

We first determine whether the Commonwealth's appeal was timely. Pennsylvania Rule of Appellate Procedure 311(a)(3) provides that "[a]n appeal may be taken as of right" from an order changing venue. Pa.R.A.P. 311(a)(3). As to the timing of such an appeal, our rules state in pertinent part: "An appeal from any of the following orders shall be taken within ten days after the entry of the order from which the appeal is taken: (i) An order changing venue or venire in a criminal proceeding. See Rule 311(a)(3) (change of

---

[2] We note that although the Commonwealth listed four issues in its statement of questions, it included only two sections in its argument, with one addressing the first issue and another addressing the remaining three together. **See** Commonwealth's brief at 13 (noting in the heading of the second argument section that it addresses "Commonwealth's issue 2 and 3), 21 (assailing the court's reliance on an article that it found through its own independent research). In accordance with the Commonwealth's argument structure, we will address the issues raised in a like manner. However, we remind the Commonwealth that, like defendants appealing their judgments of sentence, it too is bound by our Rules of Appellate Procedure. **See** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]").

criminal venue or venire)." Pa.R.A.P. 903(c)(1)(i).  Rule 108, which governs the date of entry of orders, provides as follows:

**(a) General rule.**

(1) [With exceptions not applicable here], in computing any period of time under these rules involving the date of entry of an order by a court or other government unit, the day of entry shall be the day the clerk of the court or the office of the government unit mails or delivers copies of the order to the parties, or if such delivery is not otherwise required by law, the day the clerk or office of the government unit makes such copies public.  The day of entry of an order may be the day of its adoption by the court or other government unit, or any subsequent day, as required by the actual circumstances.

. . . .

**(d) Criminal Orders.**

(1) In determining the date of entry of criminal orders, subdivision (a)(1) shall apply except as provided in subparagraph (d)(2).

(2) In a criminal case in which no post-sentence motion has been filed, the date of imposition of sentence in open court shall be deemed to be the date of entry of the judgment of sentence.

Pa.R.A.P. 108.

Indeed, the timing of a judgment of sentence is unique in that our Supreme Court has focused not on the date the judgment is entered on the docket by written order, but "upon the imposition of sentence in open court." Pa.R.A.P. 301(a)(2).  ***See Commonwealth v. Green***, 862 A.2d 613, 619 (Pa.Super. 2004) (noting the difference in Rule language between the date of entry of orders and the date of imposition of sentence and observing that there is "no reason to assume that the Supreme Court Rules Committee does

- 5 -

not know the difference between the date a sentence is imposed and the date a sentence is entered on the docket"). In all other circumstances, "no order of a court shall be appealable until it has been entered upon the appropriate docket in the trial court. Where under the applicable practice below an order is entered in two or more dockets, the order has been entered for the purposes of appeal when it has been entered in the first appropriate docket." Pa.R.A.P. 301(a)(1). Excepting judgments of sentence, "a direction by the trial court . . . that a specified judgment, sentence or other order shall be entered, unaccompanied by actual entry of the specified order in the docket, does not constitute an appealable order. Any such order shall be docketed before an appeal is taken." Pa.R.A.P. 301(c). In sum, "[i]n a criminal case, the date of entry of an order is the date the clerk of courts enters the order on the docket, furnishes a copy of the order to the parties, and records the time and manner of notice on the docket." *Commonwealth v. Jerman*, 762 A.2d 366, 368 (Pa.Super. 2000) (cleaned up). Using the date of imposition in open court for a judgment of sentence is the exception, not the rule.

Presently, the Commonwealth did not appeal from a judgment of sentence, but from an order granting Appellee's motion to change venue. The trial court and Appellee insist that the Commonwealth's appeal was not timely filed within ten days of the order in question because they calculate the start day as August 9, the day the court announced its decision in open court and dated the written order. Contrarily, the Commonwealth insists that the appeal

period did not begin to run until August 14, the date the order was entered on the docket.

In conformity with the relevant rules, we agree with the Commonwealth that the operative date is the day the order was entered on the docket, not when the court stated or dated its ruling. **See** Pa.R.A.P. 108(a)(1); Pa.R.A.P. 301(a)(1). Accordingly, no appealable order was entered until August 14, 2023, and the Commonwealth's notice of appeal filed on August 23, 2023, was timely filed within ten days of that order. Thus, we may proceed to the merits of the Commonwealth's challenges.

The Commonwealth's substantive claims all concern the trial court's order granting Appellee's motion to change venue. In that regard, our review is governed by the following principles. We review challenges to venue rulings for an abuse of discretion because the trial court "is in the best position to assess the atmosphere of the community and to judge the necessity of the requested change." **Commonwealth v. Karenbauer**, 715 A.2d 1086, 1092 (Pa. 1998) (cleaned up). As explained by this Court, "[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Rogers**, 259 A.3d 539, 541 (Pa.Super. 2021) (cleaned up).

The Rules of Criminal Procedure provide that "[v]enue or venire may be changed by [the trial] court when it is determined after hearing that a fair and

impartial trial cannot otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584(A). Here, Appellee sought the venue change based upon pretrial publicity. Generally, media coverage on its own does not support a change of venue. Rather, a defendant bears the burden of establishing that the "publicity resulted in actual prejudice that prevented the impaneling of an impartial jury." *Commonwealth v. Hawkins* 701 A.2d 492, 504 (Pa. 1997) (cleaned up).

Notwithstanding that metric, our courts have not restricted venue changes to only those cases that involve actual prejudice. *See Karenbauer*, 715 A.2d at 1092 (noting that presumed prejudice "is an exception to the requirement that the defendant demonstrate actual prejudice"). Rather, courts may find prejudice from pretrial publicity to be presumed, pursuant to the following inquiry:

> if the defendant is able to show that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue is not warranted unless the defendant also demonstrates that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

> In testing whether there has been a sufficient cooling period, a court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus,

- 8 -

in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Commonwealth v. Dewald*, 317 A.3d 1020, 1042 (Pa.Super. 2024) (cleaned up).

In the instant matter, the trial court supplied extensive reasoning in support of its determination that the pretrial publicity in this case resulted in presumptive prejudice warranting a change in venue. *See* Trial Court Opinion, 10/11/23, at 7-9. Preliminarily, it outlined the history of jury selection during the first trial, noting that "inflammatory publicity was disseminated to the media by the office of the [p]rosecuting attorney during jury selection[.]" *Id*. at 7 (cleaned up). The court explained that a change in venue was inappropriate at that time because jury selection had not yet occurred, but it issued the above-referenced gag order to stem the flow of publicity from the parties surrounding the trial. In anticipation of a retrial following the hung jury, Appellee moved to change venue. At the hearing on August 9, 2023, he offered exhibits, including, as summarized by the trial court:

a plethora of ongoing articles and news reports from the past three years, many of which linked this criminal trial to the multi-million-dollar civil settlement with the City of Philadelphia, the firing of Appellee from the police department, and connections to the George Floyd protest and other police incidents. Numerous

local media - print, radio, television, and social media - reported the incident referencing "former SWAT officer" or incorrectly mentioned "tear gas" as the substance used. The visual media accounts commonly depicted the same photograph of the Appellee standing above the seated protesters spraying down on them.

Trial Court Opinion, 10/11/23, at 8.

As to whether a sufficient cooling off period had occurred, the court detailed the pervasiveness of this publicity in Philadelphia County:

The court concluded the media coverage of this trial has been ongoing and ubiquitous throughout Philadelphia County. The protests occurred in the City of Philadelphia in June of 2020. Over three years after the incident, this case remains a top news story, with every hearing and aspect of the case covered by local media. Each time the case is referenced in the visual media, it includes a photograph depicting a reenactment of the incident - the alleged crime by the accused. Additionally, the Philadelphia Office of the District Attorney has encouraged additional publicity by issuing media releases and holding press conferences in anticipation of trial related events.

*Id*. at 8-9 (cleaned up). Based upon the foregoing, the court determined that "the pre-trial and continuous publicity in this matter is so extensive, sustained, and pervasive that the community of Philadelphia County must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Id*. at 9 (cleaned up).

The Commonwealth contests the court's characterization of the articles and its finding of presumptive prejudice because it insists that "each article was factual and objective, presenting the issues in a fair and balanced manner." Commonwealth's brief at 16. Moreover, it maintains that the May

- 10 -

1, 2023 media advisory from the office of the District Attorney was neither inflammatory nor influential because the articles referenced by Appellee in his motion did not repeat the erroneous statement that Appellee used tear gas on the demonstrators. *Id*. at 23-24. The Commonwealth also rejects the contention that the pretrial publicity included any reenactments, since the referenced photograph of Appellee spraying the demonstrators merely showed the act itself. *Id*. at 21-22. Further, it assails the court's reliance on an August 9, 2023 article, which the court found through its own research and was *dehors* the record. *Id*. at 21. Finally, the Commonwealth relies upon the ability of the court "to empanel a fair and impartial jury with relative ease" during the first trial as evidence that a sufficient cooling-off period has occurred. *Id*. at 25.

Preliminarily, we note that the August 9, 2023 article referenced in the trial court's August 14, 2023 order cannot have had any bearing on its decision to grant Appellee's motion to change venue because it was disseminated "within hours of [that day]'s hearing" and was specifically reporting on the court's ruling from the bench to grant the motion. **See** Order, 8/14/23, at 3; **see also** Trial Court Opinion, 10/11/23, at 8 (mentioning article entitled "Former SWAT Officer who pepper sprayed protesters will be tried outside of Philadelphia" along with the drove of media in the weeks following its ruling).

Rather, our review of the certified record confirms the trial court's findings. Appellee introduced a sample of articles ranging from the time of

the incident through May 25, 2023. The articles generally fell into four categories. The first included brief and benign references to the status of the case in a general news roundup format.

The second batch focused solely on the June 1, 2020 incident and Appellee's trial, detailing the underlying events and linking to the New York Times video investigation of Appellee pepper spraying the demonstrators. One article in this collection included the following quote from the District Attorney, Larry Krasner, regarding reinstatement of the charges: "'I am grateful today that a Common Pleas judge watched the same video millions of us watched last summer and agreed that this matter should be pursued and resolved in a court of law.'" Jordan Levy, "Mistrial declared: What you need to know about the former Philly SWAT officer seen pepper-spraying protestors -A hung jury ended the trial, the first of a Philadelphia law enforcement officer involved in police operations during the 2020 protests.", Billy Penn (online), 8 May 2023, https://infoweb.newsbank.com/apps/news/document-view?p=AWNB&docref=news/191687D22488E3D8.

Third, several articles connected the pepper spraying incident to the protests that summer and the general police response, including the use of tear gas and rubber bullets. *See e.g.*, Claudia Lauer, "Philadelphia officer charged with pepper spraying kneeling protesters," Morning Call, The: Web Edition Articles (online), 22 Jul 2020, https://infoweb.newsbank.com/apps/news/document-view?p=AWNB&docref=news/17(6813EDBAE9BEO ("A video of

[Appellee] dressed in riot gear approaching three protesters kneeling on Interstate 676 on June 1, pulling down at least one protester's mask or goggles, then pepper-spraying them was circulated widely on social media and has been included in several news stories about the national police response to demonstrators.").

Finally, the last group of features concerned unchecked and excessive use of force by police in general, citing Appellee as an example based upon unrelated shootings from 2018 and 2012, which were not prosecuted. Most of the reporting in all categories note that Appellee was fired as a result of his conduct on June 1, 2020.

Critically, the New York Times link included in the media advisory sent by the District Attorney's Office during jury selection and referenced in several articles is a ten-minute video investigation of the events occurring on June 1, 2020. Although it does not specifically mention Appellee's name, it included a timeline of what happened that day, including the overall police response and the subject pepper spraying episode. To compile this video investigation, the New York Times utilized a mixture of digital reenactments, live footage, and interviews by attendees. Notably, Mr. Hough, one of the alleged victims in the underlying case against Appellee, provides his accounting of the pepper spraying and narrates over a video capturing the incident. There is also a demonstrative exhibit of the Philadelphia Police Department's guidelines regarding use of pepper spray. The video concludes by stating that within

hours of publishing the video investigation on June 25, 2020, "Philadelphia officials announced a moratorium on the use of tear gas in the city" and "a SWAT officer involved in the response was expected to be put on a 30-day suspension 'with intent to dismiss.'" Christopher Koettl, Nilo Tabrizy, Muyi Xiao, Natalie Reneau and Drew Jordan, "How the Philadelphia Police Tear-Gassed a Group of Trapped Protestors," The New York Times, 25 June 2020, https://www.nytimes.com/video/us/100000007174941/philadelphia-tear-gas-george-floyd-protests.html.

During the individual *voir dire* conducted over two days preceding Appellee's first trial, many members of the jury pool indicated that they had heard about the incident on social media, local news, and national news. **See** N.T. *Voir Dire,* 5/1/23, at 12 (noting there were "many people that raised [their] hand and indicated that [they] had heard something about this incident prior to coming to court today"). According to several venirepersons, the protests that day were "all over the news." **Id**. at 16, 95, 27 ("a lot of TV coverage"), 12 ("of course I seen it on TV"). The coverage of the protest seemed particularly prevalent to those living near where the demonstrations occurred in the city and county of Philadelphia, and the pool of jurors questioned about their media exposure even included three individuals with personal connections to the protests that day. **Id**. at 6-7 (juror who lived downtown was "very aware" of the "protests and riots" and "[t]he city was a mess"), 53 (juror "followed the riots pretty closely. It affected my

neighborhood. . . . I was watching the news about it almost every day"); N.T. *Voir Dire*, 5/2/23, at 19 (juror heard about it "on the news" and "obviously living here").

Eight potential jurors recalled reading about or seeing specific coverage of the underlying incident, and six indicated that the media coverage negatively impacted them or that they were unsure whether they could be unbiased. Three jurors explicitly expressed significant bias against Appellee based upon what they witnessed in the media. As summed up by one juror, "[t]here was a lot on the news, but that the police had pepper-sprayed the protestors, and that it was excessive and they were harmed. . . . I feel like it was at a time when it was just like a lot of stuff going on with the cops and it seemed like it was on the news all the time." N.T. *Voir Dire*, 5/1/23, at 63-64; **see also** 73-74 ("What I saw was a defenseless person being assaulted. What I saw was somebody abusing their power."), 86 (explaining that it was "disturbing to [the juror] to see" video of "an officer walking up to a woman and pulling her hands down to spray her in the face").

Of those specifically questioned about their exposure to pre-trial publicity, nine jurors were struck for cause related to bias or personal connection to the protests, and one juror was struck based upon involvement in the civil settlement process. Four individuals were struck by the Commonwealth and two by the defense, and six were accepted as jurors for trial after attesting that they could be impartial. One of those individuals

stricken for cause had discussed the television coverage of the pepper-spraying incident with others in the jury pool during the lunch break, likening it to police brutality in the 1960s. *Id*. at 85-87. Similarly, one juror accepted as an alternate described the media coverage as showing "protestors who were grabbed and thrown down and maced." N.T. Jury Selection, 5/2/23, at 26.

The foregoing supports the trial court's finding that the media coverage was skewed towards conviction and invoking strong feelings against Appellee, revealed a history of violence in Appellee's position as a police officer, and included reenactments of the events that day in the New York Times video investigation, which was specifically sent to news outlets by the District Attorney's Office **during** jury selection.[3] Moreover, despite three years

_____

[3] We reiterate the function of the District Attorney's Office as a prosecuting agency: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Pa.R.P.C. Rule 3.8, Explanatory Comment 1. The Supreme Court of the United States explained long ago that a prosecutor "may prosecute with earnestness and vigor—indeed, he should do so." **Berger v. United States**, 295 U.S. 78, 88 (1935). However, "while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." **Id**.

Our Supreme Court has taken pains to further proscribe a prosecutor's performance regarding pre-trial publicity within Rule 3.8, which governs the "special responsibilities" of prosecutors. **See** Pa.R.P.C. 3.8. Specifically, it is mandated that a prosecutor shall:
*(Footnote Continued Next Page)*

passing between the incident and *voir dire*, the record bears out that the media coverage "was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there

_____

> (e) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule.

Pa.R.P.C. 3.8(e). This subsection addresses the reality that "a prosecutor's extrajudicial statement can create the additional problem of increasing public condemnation of the accused." Pa.R.P.C. 3.8, Explanatory Comment 4. For example, while an announcement that a particular person had been indicted "will necessarily have severe consequences for the accused, a prosecutor can, and should, avoid comments which have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium of the accused." ***Id***.

Here, the District Attorney's Office disseminated the New York Times video investigation to the media **during** jury selection. Given its special responsibility in the just prosecution of criminal cases, the office does not have the luxury of acting as a casual social media participant reposting content unchecked. Moreover, we express serious concern over the District Attorney himself being quoted in news articles as expressing gratitude "that a Common Pleas judge watched the same video millions of us watched last summer" in permitting the charges to proceed to court. ***See e.g.***, Jordan Levy, "Mistrial declared: What you need to know about the former Philly SWAT officer seen pepper-spraying protestors -A hung jury ended the trial, the first of a Philadelphia law enforcement officer involved in police operations during the 2020 protests.", Billy Penn (online), 8 May 2023. The conduct of the District Attorney's Office in this case was calculated to churn up community support for charging Appellee, encouraged the sensationalized reporting surrounding Appellee's prosecution, and justified the trial court's proper exercise of discretion in finding prejudicial pre-trial publicity warranted a change in venue.

- 17 -

was insufficient time between the publicity and the trial for any prejudice to have dissipated." ***Dewald***, 317 A.3d at 1042 (cleaned up). Accordingly, we discern no abuse of discretion in the trial court's determination that a venue change was proper in this case based upon the presumptive prejudice against Appellee resulting from the pre-trial publicity. Thus, we affirm the order granting his request to change venue.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/06/2024